**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, Inc., | ) | |
| AMERICAN CIVIL LIBERTIES UNION | ) | |
| FOUNDATION, Inc., | ) | |
|     125 Broad Street, 18th Floor | ) | |
|     New York, NY 10004 | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| DONALD TRUMP, in his official capacity | ) | |
| as President of the United States, | ) | |
|     1600 Pennsylvania Avenue NW | ) | |
|     Washington, DC 20500, | ) | |
| | ) | |
| MICHAEL PENCE, in his official capacity | ) | |
| as Vice President of the United States | ) | |
| and chair of the Presidential Advisory | ) | |
| Commission on Election Integrity, | ) | |
|     1 Observatory Circle NW | ) | |
|     Washington, DC 20008, | ) | |
| | ) | |
| PRESIDENTIAL ADVISORY | ) | |
| COMMISSION ON ELECTION INTEGRITY, | ) | |
| an advisory committee commissioned | ) | |
| by President Donald Trump, | ) | |
|     Eisenhower Executive Office Building | ) | |
|     1650 Pennsylvania Avenue NW | ) | |
|     Washington, DC 20502 | ) | |
| | ) | |
|     Defendants. | ) | |

_____)

## COMPLAINT FOR DECLARATORY AND MANDAMUS RELIEF

Plaintiffs American Civil Liberties Union and American Civil Liberties Union

Foundation (together, the "ACLU") bring this action against Donald Trump, in his official

capacity as President of the United States ("President Trump"), Michael Pence, in his official

capacity as Vice President of the United States and chair of the Presidential Advisory

Commission on Election Integrity ("Vice President Pence"), and the Presidential Advisory Commission on Election Integrity ("Pence-Kobach Commission") (collectively, "Defendants"), seeking relief in the nature of mandamus compelling Defendants to comply with the nondiscretionary requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, and a declaration that Defendants have violated FACA.

Defendants have violated FACA in two respects. *First*, Vice President Pence and the Pence-Kobach Commission have already violated, and absent relief, will continue to violate the non-discretionary transparency and public access requirements of § 10 of FACA, 5 U.S.C. app. 2 § 10. The Pence-Kobach Commission has already held its first meeting without public notice; without making that meeting open to the public; and without timely notice in the Federal Register, *id.* § 10(a). It has also failed to make any of its "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission "available for public inspection," *id.* § 10(b). The second meeting of the Pence-Kobach Commission is now scheduled to take place in a building generally inaccessible to the public, and none of the documents already relied upon by the Commission have been made available to the public.

*Second*, President Trump has violated requirements under § 5 of FACA, 5 U.S.C. app. 2 § 5, that an advisory committee's membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," *id.* § 5(b)(2); and that "appropriate provisions" be made "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[,]" *id.* § 5(b)(3). The Pence-Kobach Commission's stated purpose is to "study the

registration and voting processes used in Federal elections" and "submit a report to the President" on related "laws, rules, policies, activities, strategies, and practices." Exec. Order No. 13,799, § 3, 82 Fed. Reg. 22389 (May 11, 2017). But, in fact, the Commission was established for the purpose of providing a veneer of legitimacy to President Trump's false claim that he won the popular vote in the 2016 election—once millions of supposedly illegal votes are subtracted from the count. That purpose is evident in the composition of the Commission, which is stacked with individuals who have endorsed the President's false statements about the popular vote, and the fact that no provisions whatsoever have been made to insulate the Commission's advice and recommendations from inappropriate influence by the person who appointed the Commission's members—*i.e.*, President Trump himself.

## THE PARTIES

1.      Plaintiff American Civil Liberties Union is a 501(c)(4) non-profit, nationwide, non-partisan membership organization with approximately 1.6 million members, many of whom are registered voters. The ACLU is dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including laws protecting access to the right to vote.

2.      Plaintiff American Civil Liberties Union Foundation is a 501(c)(3) non-profit, nationwide, non-partisan organization with nearly 300 staff attorneys, thousands of volunteer attorneys, and offices throughout the nation. Since 1965, the ACLU, through its Voting Rights Project, has litigated hundreds of voting rights cases and has a direct interest in ensuring that all eligible citizens are able to access the franchise and are not removed from voter rolls, and in empowering those targeted by vote suppression. The ACLU regularly litigates cases in which government officials attempt to limit access to the franchise and keep eligible voters off the

registration rolls, and therefore has a direct interest in the purported purpose of the Presidential

Advisory Commission on Election Integrity ("Pence-Kobach Commission").

3.      Defendant Donald Trump is the President of the United States.  He is sued in his

official capacity.   In that capacity, he issued Executive Order 13,799 of May 11, 2017,

establishing the Pence-Kobach Commission, and appoints the members of the Commission.

4.      Defendant Michael Pence is the Vice President of the United States.  He is sued in

his official capacity.  In that capacity, Vice President Pence is the chair of the Pence-Kobach

Commission.

5.      Defendant Presidential Advisory Commission on Election Integrity ("Pence-

Kobach Commission") was established by President Trump pursuant to Executive Order 13,799,

and is a presidential advisory committee.  Exec. Order No. 13,799.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.  Plaintiffs

also seek relief pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## FACTS

### I.      Statutory and Regulatory Framework

8.      The Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, was

enacted because of the congressional concern with the number and utility of advisory

committees.  Congress found, among other things, that committees "should be established only

when they are determined to be essential" and that "Congress and the public" should be kept

abreast of their activities.  5 U.S.C. app. 2 § 2(b).  "FACA's principal purpose was to establish

procedures aimed at enhancing public accountability of federal advisory committees."  *Ctr. for*

*Law & Educ. v. U.S. Dep't of Educ.*, 209 F. Supp. 2d 102, 113 (D.D.C. 2002), *aff'd* 396 F.3d 1152 (D.C. Cir. 2005); *see also Food Chem. News, Inc. v. Davis*, 378 F. Supp. 1048, 1051 (D.D.C. 1974) (purpose of FACA "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals").

9.      FACA applies to "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President," denominating such groups as "advisory committees."  5 U.S.C. app. 2 § 3(2).

10.     Only those committees that are "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or "created by the National Academy of Sciences or the National Academy of Public Administration" fall outside the definition of "advisory committee" under the Act. 5 U.S.C. app. 2 § 3(2).  And all of the provisions of FACA apply to advisory committees except when an "Act of Congress establishing any such advisory committee specifically provides otherwise."  5 U.S.C. app. 2 § 4(a).

11.     FACA requires that in establishing an advisory committee, the President "shall" follow the guidelines of the statute, 5 U.S.C. app. 2 § 5(c), including that the directive establishing the advisory committee must, among other things, "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(2)-(3).

12.     FACA demands transparency in the procedures and meetings of advisory committees.  All advisory committee meetings must be open to the public and must be timely noticed in the Federal Register.  5 U.S.C. app. 2 § 10(a)(1)-(2).  Interested members of the public must "be permitted to attend, appear before, or file statements with any advisory committee," subject only to "reasonable" regulations set by the Administrator of General Services.  *Id*. § 10(a)(3).  Although portions of meetings may be closed where the President determines that closure is provided for pursuant to 5 U.S.C. § 552b(c) (the federal Open Meetings statute), any such determination must be made in writing and set forth the reasons for the conclusion. 5 U.S.C. app. 2 § 10(d).

13.     Advisory committee meetings must be noticed in the Federal Register at least fifteen days before the meeting is to be held.  41 C.F.R. § 102-3.150(a).

14.     Each advisory committee meeting must be "held at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." 41 C.F.R. § 102-3.140(a)-(b).

15.     If an advisory committee meeting is held via teleconference, videoconference, or other electronic medium, it still must be made accessible to the public. 41 C.F.R. § 102-3.140(e).

16.     Subject to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports."  5 U.S.C. app. 2 § 10(b).

17.     FACA mandates that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee.  The accuracy of all minutes shall be certified to by the chairman of the advisory committee."  5 U.S.C. app. 2 § 10(c).

18.     Advisory committees must make available copies of transcripts of advisory committee meetings to "any person" at only the "actual cost of duplication."  5 U.S.C. app. 2 § 11(a).

19.     Each of the requirements of FACA is mandatory on the appointing authority, in this case, President Trump, and on the advisory committee itself.

## II.     The Creation of the Pence-Kobach Commission

### A.  Events Leading to the Creation of the Pence-Kobach Commission

20.     Following the 2016 Presidential Election, the official results of the popular vote indicated that 65,853,516 votes were cast for Democratic nominee, Hillary Rodham Clinton, and 62,984,825 votes were cast for Republican nominee, Donald Trump, and the official results of the Electoral College indicated that 227 Electoral College votes were cast for Democratic nominee Hillary Rodham Clinton, and 304 Electoral College votes were cast for Republican nominee Donald Trump.  Federal Election Commission ("FEC"), Official 2016 Presidential General Election Results (Jan. 30, 2017), *available at* https://transition.fec.gov/pubrec/fe2016/2016presgeresults.pdf.

21.     On November 20, 2016, President Elect Trump met with Kansas Secretary of State Kris Kobach, now vice-chair of the Pence-Kobach Commission.  Outside that meeting, Secretary Kobach was photographed by the Associated Press with a document that appeared to

reference proposed amendments to the National Voter Registration Act, 52 U.S.C. §§ 20501-511. *See, e.g.*, Peter Hancock, *Kobach Ordered To Turn Over Document He Used in Meeting with Trump*, Lawrence J.-World (Apr. 5, 2017), http://www2.ljworld.com/news/2017/apr/05/kobach-ordered-turn-over-document-he-used-meeting-/; *see also* Order, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. Apr. 17, 2017) (ECF No. 320); Order, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. June 23, 2017) (ECF No. 355).

22.     On November 27, 2016, President Elect Trump tweeted, "In addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally." *See* Donald Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 12:30 PM), https://twitter.com/realDonaldTrump/status/802972944532209664.

23.     On November 30, 2016, Secretary Kobach, now vice-chair of the Pence-Kobach Commission stated, "I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton at this point." Hunter Woodall, *Kris Kobach Agrees with Donald Trump that 'Millions' Voted Illegally But Offers No Evidence*, Kan. City Star (Nov. 30, 2016), http://www.kansascity.com/news/politics-government/article117957143.html [hereinafter Woodall, *Kris Kobach Agrees with Donald Trump*].

24.     President Trump has continued to assert, contrary to all available factual evidence and the findings of the FEC, that he won the popular vote. *See, e.g.*, Charles Ventura, *Trump Revives False Claim That Illegal Ballots Cost Him Popular Vote*, USA Today (Jan. 23, 2017), https://www.usatoday.com/story/news/politics/onpolitics/2017/01/23/president-trump-illegal-ballots-popular-vote-hillary-clinton/96976246/; Aaron Blake, *Donald Trump Claims None of Those 3 to 5 Million Illegal Votes Were Cast for Him. Zero.*, Wash. Post (Jan. 26, 2017),

https://www.washingtonpost.com/news/the-fix/wp/2017/01/25/donald-trump-claims-none-of-those-3-to-5-million-illegal-votes-were-cast-for-him-zero/?tid=a_inl&utm_term=.1e862115ce52.

25.     Indeed, President Trump's own legal team argued that "[a]ll available evidence suggests that the 2016 general election was *not* tainted by fraud or mistake."  Donald J. Trump and Donald J. Trump for President, Inc.'s Objs. to Dr. Jill Stein's Recount Pet. at 2, In re Pet. for Recount for the Office of President of the United States of America (Mich. Bd. of State Canvassers Dec. 1, 2016), *available at* https://www.michigan.gov/documents/sos/Objection_to_Recount_Petition_544089_7.pdf.

26.     Vice President Pence attended and participated in the meeting with congressional leaders at which President Trump asserted he won the popular vote but for illegal voters.  *See The Latest: Trump Repeats Unproven Claim of Illegal Votes*, Associated Press (Jan. 24, 2017), https://www.apnews.com/2987214f67da4b2d8900bc995e864912.

27.     On February 9, 2017, at a meeting with ten Senators on the Supreme Court nomination, President Trump asserted that he and former-Senator Kelly Ayotte would both have won New Hampshire but for "'thousands' of people who were 'brought in on buses' from neighboring Massachusetts to 'illegally' vote in New Hampshire."  Eli Stokols, *Trump Brings up Vote Fraud Again, This Time in Meeting with Senators*, Politico (Feb. 10, 2017), http://www.politico.com/story/2017/02/trump-voter-fraud-senators-meeting-234909.  No factual evidence supports that assertion.

B.  Composition of the Pence-Kobach Commission

28.     On May 11, 2017, President Trump issued Executive Order 13,799, establishing the Pence-Kobach Commission.  The Executive Order provides that the Commission would be chaired by the Vice President, be composed of not more than fifteen additional members selected

by the President, and that the Vice President may select a vice chair from among the other members.  Exec. Order No. 13,799, § 2.

29.     The purported "[m]ission" of the Pence-Kobach Commission is to "study the registration and voting processes used in Federal elections."  Exec. Order No. 13,799, § 3.  The Commission is to "submit a report to the President that identifies . . . those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections; . . . those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of the voting processes used in Federal elections; and . . . those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting."  *Id.*

30.     The Executive Order does not contain any provisions that "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority," 5 U.S.C. app. 2 § 5(b)(3), in this case, President Trump.  *See* Exec. Order No. 13,799.

31.     Also on May 11, 2017, President Trump named Secretary Kobach as Vice Chair of the Commission.   Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission [hereinafter "Executive Order Release"].

32.     Upon the issuance of the Executive Order, President Trump also named five additional members of the Pence-Kobach Commission: Connie Lawson, Secretary of State of Indiana; Bill Gardner, Secretary of State of New Hampshire; Matthew Dunlap, Secretary of State

of Maine; Ken Blackwell, Former Secretary of State of Ohio; and Christy McCormick, Commissioner, Election Assistance Commission. *See* Executive Order Release.

33.     At least four out of these six initial appointees to the Commission have a record of making exaggerated and/or baseless claims about voter fraud, and/or have implemented or supported policies that have unlawfully disenfranchised voters.

34.     Secretary Kobach has repeatedly made exaggerated claims about non-citizen voting.  The United States Court of Appeals for the Tenth Circuit, in a decision finding that Secretary Kobach has engaged in the "mass denial of a fundamental constitutional right," because he disenfranchised 18,000 motor-voter applicants in Kansas, found that Secretary Kobach's assertions about widespread non-citizen voting were "pure speculation."  *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016).  In the same case, Secretary Kobach was recently sanctioned by the magistrate judge for "deceptive conduct and lack of candor," and for making "patently misleading representations to the court" about the document that he carried into his November 20, 2016 meeting with President-elect Trump.  *Fish v. Kobach*, No. 16-cv-2105-JAR, 2017 WL 2719427, at *2-*3, *5 (D. Kan. June 23, 2017).

35.     When recently asked about his previous statements about Donald Trump winning the popular vote and the absence of evidence to support this claim, Secretary Kobach replied, "I guess it all depends on what you define as evidence."  "Voting Commissioner Kris Kobach Defends U.S. Request For Voter Information," *All Things Considered*, Nat'l Pub. Radio (June 30, 2017), http://www.npr.org/2017/06/30/535059231/voting-commissioner-kris-kobach-defends-u-s-request-for-voter-information.

36.     Like Secretary Kobach, Commission member Ken Blackwell has made unfounded assertions about noncitizens voting.  In response to President Trump's claims that he

had won the popular vote but for illegal votes, Mr. Blackwell penned a commentary asserting that Secretary Clinton received over 800,000 illegal votes from non-citizens, and based this claim on the work of Old Dominion University professor Jesse Richman.  Ken Blackwell, *Election Integrity Can't Wait*, The Daily Caller (Feb. 7, 2017), http://dailycaller.com/2017/02/07/electoral-integrity-cant-wait/.   Professor Richman, however, disclaimed this use of his research, expressly stating that he has not done a study of the 2016 election.  *See* Jesse Richman, "I Do Not Support the Washington Times Piece" (Jan. 27, 2017), https://fs.wp.odu.edu/jrichman/2017/01/27/i-do-not-support-the-washington-times-piece/.

Professor Richman has also expressly written, "My study DOES NOT support Trump's claim that millions of non-citizens voted in the 2016 election."  Jesse Richman, "Why I Would Sign the 'Open Letter' If It Were True" (March 10, 2017), https://fs.wp.odu.edu/jrichman/2017/03/10/why-i-would-sign-the-open-letter-if-it-were-true/.

37.    Like Secretary Kobach, Mr. Blackwell has unlawfully disenfranchised voters.  As Secretary of State of Ohio, Mr. Blackwell announced on September 7, 2004, less than a month before the voter registration deadline for the 2004 general election, that voter registration forms would be processed only if they were printed on eighty-pound unwaxed white paper stock, specifying that complete voter registration forms from eligible voters that were printed on less heavy-weight paper would not be processed.  *See* Ohio Secretary of State Directive, No. 2004-31, Section II (Sept. 7, 2004).  The directive was later reversed.  Regarding that same election, the Sixth Circuit Court of Appeals determined that another Directive from Mr. Blackwell violated the Help America Vote Act, denying provisional ballots to individuals clearly entitled to cast them under the law.  *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

38.     Commission member Gardner has a similar record.   Secretary Gardner has recently pushed for tightening access to the polls in New Hampshire, saying that the state has "drive-by voting."   *See* Associated Press, N.H. Pub. Radio (Nov. 26, 2016), http://nhpr.org/post/republicans-looking-tighten-nh-election-laws#stream/0.

39.     Like Secretary Kobach, Secretary Gardner has been found by a court to have unlawfully disenfranchised voters in his State.   The New Hampshire Supreme Court found that Gardner promulgated a voter registration form that was "confusing and inaccurate," and "could cause an otherwise qualified voter not to register to vote in New Hampshire."   *Guare v. New Hampshire*, 167 N.H. 658, 665, 117 A.3d 731, 738 (2015).   The Court concluded that, "as a matter of law, the burden it imposes upon the fundamental right to vote is unreasonable."   *Id.*

40.     Commission member McCormick has a similar record of supporting policies and practices that have disenfranchised voters.   In litigation involving Vice Chair Kobach's efforts to require documentary proof of citizenship from individuals registering to vote with the federal voter registration form, EAC Commissioner McCormick attempted to reject the Department of Justice as counsel for the EAC and retain her own personal counsel, in order to file memoranda and declarations in support of Secretary Kobach's position in the case.   *See* Docket, *League of Women Voters v. Newby*, No. 16-cv-236-RJL (D.D.C.).   The D.C. Circuit later ruled that the documentation requirements favored by Secretary Kobach and Commissioner McCormick created "a substantial risk that citizens will be disenfranchised in the present federal election cycle[,]" and will "make it substantially more difficult for groups like the League[ of Women Voters] to register otherwise qualified voters."   *League of Women Voters v. Newby*, 838 F.3d 1, 12-13 (D.C. Cir. 2016).

41.    On June 21, 2017, President Trump named three additional Commission members: Luis Borunda, David K. Dunn, and Mark Rhodes.  Press Release, Office of the Press Secretary, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (June 21, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/21/president-donald-j-trump-announces-intent-nominate-personnel-key.  Two of these appointees have no experience with election administration.

42.    Mark Rhodes is the county clerk of Wood County, West Virginia, a county with 56,105 registered voters.  *See* W.V. Secretary of State, Voter Registration Totals, http://www.sos.wv.gov/elections/VoterRegistration/Pages/Voter_Registration.aspx (last visited July 6, 2017).  Upon his appointment, Clerk Rhodes stated that he was not sure why he was appointed to the Pence-Kobach Commission, and that he thought that West Virginia's Republican Secretary of State recommended him because Vice President Pence and Vice Chair Kobach were looking for a Democratic county clerk, and "there's not a whole lot of those in West Virginia."  Kira Lerner, *The White House's Voter Fraud Commission Is Starting To Take Shape*, Think Progress (June 22, 2017), https://thinkprogress.org/fraud-commission-rhodes-bf8cd04daec4.

43.    David K. Dunn was previously a member of the Arkansas House of Representatives.  He does not have any experience in administering elections.  Capitol Partners, http://www.capitolpartners.co/partners/ (last visited July 6, 2017).  Upon his appointment, Mr. Dunn stated, "I don't know why this has fallen on my shoulders . . . I'm just a very small old country boy from Arkansas in this bigger commission with Vice President Pence, and I'm just going to do the best I can, to be honest."  Arkansas's Republican Secretary of State recommended him to the Commission.  Sam Levine, *Some of Trump's New Election*

*Investigators Don't Seem To Have Much Election Experience*, Huffington Post (June 22, 2017), *available at* http://www.huffingtonpost.com/entry/trump-voter-fraud-commission_us_594c1068e 4b01cdedf01e75e?3pa.

44.     Luis Borunda is the Deputy Secretary of State of Maryland, a position that has no elections-related responsibilities.  On July 3, 2017, Deputy Secretary Borunda resigned from the Pence-Kobach Commission. *See* Luke Broadwater, *Maryland Official Resigns from Trump Voter Fraud Panel*, Balt. Sun (July 3, 2017), http://www.baltimoresun.com/news/maryland/politics/bs-md-borunda-resigns-trump-20170703-story,amp.html.

45.     On June 29, 2017, President Trump named Hans A. von Spakovsky as a member of the Pence-Kobach Commission.  Press Release, Office of the Press Secretary, President Donald J. Trump Announces Key Additions to his Administration (June 29, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/29/president-donald-j-trump-announces-key-additions-his-administration.

46.     Mr. von Spakovsky has a long history of making baseless claims about voter fraud.  *See, e.g.*, Jane Mayer, *The Voter-Fraud Myth*, The New Yorker (Oct. 29-Nov. 5, 2012), http://www.newyorker.com/magazine/2012/10/29/the-voter-fraud-myth; Richard L. Hasen, The Voting Wars 62-64, 129 (Yale Univ. Press 2012). In response to President Trump's baseless claims that he had won the popular vote but for illegal votes, Mr. von Spakovsky wrote, "there is a real chance that significant numbers of noncitizens and others are indeed voting illegally." Hans A. von Spakovsky & John Fund, *Do Illegal Votes Decide Elections?*, Wall St. J. (Nov. 30, 2016), https://www.wsj.com/articles/do-illegal-votes-decide-elections-1480551000.

C.   Offices and Logistics of the Pence-Kobach Commission

47.   The office location and address of the Pence-Kobach Commission has not been made public.

48.   The Pence-Kobach Commission's Designated Federal Officer is an Associate Counsel in the Office of the Vice President, which is an office within the Executive Office of the President.   The offices of the Office of the Vice President are primarily located within the Eisenhower Executive Office Building ("EEOB").

49.   The EEOB is not generally open to members of the public.   In order to enter the EEOB, a visitor must have a set meeting with a particular person in the building, who must enter the full name, Social Security Number, date of birth, citizenship status, country of birth, gender, and city and state of residence of each visitor into the White House Worker and Visitor Entry System ("WAVES"), maintained by the United States Secret Service, for review and approval prior to entry.

50.   The names of the staff of the Pence-Kobach Commission have not been made public.   The Commission is apparently staffed by employees of the Executive Office of the President.   *See* Dave Boyer, *Voter Fraud and Suppression Commission to Meet in July*, Wash. Times   (June   27,   2017),   http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-commission-to-meet-in-/ [hereinafter Boyer, *Voter Fraud and Suppression*].

51.   On July 1, 2017, a reporter for ProPublica requested for, the fifth time, a full list of staff working for the Commission.   On information and belief, she has still not received a response.

**III.   Activities of the Pence-Kobach Commission**

52.   On June 28, 2017, Vice President Pence, as chair of the Pence-Kobach

Commission, held a telephonic meeting with the members of the Commission. *See* Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election [hereinafter Pence Release].

53.     The meeting lasted for ninety minutes. *See* John DiStaso, *NH Primary Source: Gardner Says Trump Election Integrity Commission Call "Couldn't Have Been Better"*, WMUR 9 ABC (June 29, 2017), http://www.wmur.com/article/gardner-says-trump-election-integrity-commission-call-couldnt-have-been-better/10237642.

54.     This meeting of the Pence-Kobach Commission was not noticed in the Federal Register nor was it held open to the public. Upon information and belief, the agenda for the June 28 meeting was not made available for public inspection and copying, nor were any of the documents provided to the members in relation to the meeting. The meeting was therefore unlawful.

55.     The June 28 meeting was not merely an administrative or preparatory meeting. During that meeting, the Pence-Kobach Commission discussed substantive issues and made substantive decisions. It was not conducted solely to prepare for a future advisory committee meeting, to draft a position paper, or to discuss merely administrative matters.

56.     During this unlawful telephonic meeting, Vice Chair Kobach told the members of the Commission that he was sending a letter "to the 50 states and District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls and feedback on how to improve election integrity." Pence Release.

57.    During this unlawful meeting, the members of the Pence-Kobach Commission discussed issues of substance, including the potential number of double registrants and how to identify such registrations.  Celeste Katz, *Trump Election Integrity Commission Member: 'We Should Have Predicted' the Backlash*, Mic (July 5, 2017), https://mic.com/articles/181510/trump-election-integrity-commission-member-we-should-have-predicted-the-backlash#. FJyGiAIZO.

58.    Subsequent to the unlawful meeting, Commission member Secretary Dunlap reported that during the meeting, in regard to sending such letters to the states, he had advised the Commission, "to be careful how you go at this because election officials are very sensitive guardians of this information, so you want to make sure you're asking for it, not demanding it, and that it really should only cover the information that is publicly available in your state."  Sam Levine, *Trump Voter Fraud Commission Was Cautioned About Seeking Sensitive Voter Information*, Huffington Post (July 5, 2017), http://www.huffingtonpost.com/entry/trump-voter-fraud-commission_us_595d511fe4b02e9bdb0a073d  [hereinafter Levine, *Commission Was Cautioned*].

59.    At the unlawful meeting, the Commission reportedly deliberated and concluded that they did not need to review the language of the letters to the states because only Vice Chair Kobach would sign them.  Levine, *Commission Was Cautioned*; *see also* Tal Kopan, *Pence-Kobach Voting Commission Alarms States with Info Request*, CNN (July 1, 2017), http://www.cnn.com/2017/06/30/politics/kris-kobach-voter-commission-rolls/index.html   (citing statements from Commission member, Secretary Dunlap of Maine, and spokesperson for Vice President Pence, Marc Lotter).

60.     Subsequent to the Commission's determination that the Commissioners did not need to review Vice Chair Kobach's letter, on June 28, 2017, Vice Chair Kobach sent a letter to the Secretary of State of each of the fifty states and to the District of Columbia requesting submission via e-mail or FTP site by July 14, 2017, of voter roll data, including "the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *See, e.g.*, Letter from Kris Kobach to Elaine Marshall, North Carolina Secretary of State (June 28, 2017), https://assets.documentcloud.org/documents/3881856/Correspondence-PEIC-Letter-to-North-Carolina.pdf; *see also* Pence Release; Brandon Carter, *Trump Election Panel Asks All 50 States for Voter Roll Data*, The Hill (June 29, 2017), http://thehill.com/homenews/administration/340117-trump-election-integrity-commission-requests-years-of-voter-data-from.

61.     Underscoring the need for public oversight, Vice Chair Kobach's request was of such public concern that officials in 48 states have partially or fully refused to comply with the request.  *See* Ari Berman, *Suppression Plans are Backfiring Badly*, The Nation (July 5, 2017), https://www.thenation.com/article/the-trump-administrations-voter-suppression-plans-are-backfiring-badly/.

62.     Cybersecurity experts have described the Commission's plans to aggregate this data as a "gold mine" for hackers.  Eric Geller & Corey Bennett, *Trump Voter-Fraud Panel's Data Request a Gold Mine for Hackers, Experts Warn*, Politico (July 1, 2017), http://www.politico.com/story/2017/07/01/trump-voter-fraud-panel-hackers-240168.     Michael

Chertoff, the former Secretary of Homeland Security under President George W. Bush, has written an op-ed titled "Trump's Voter Data Request Poses an Unnoticed Danger," noting that "whatever the political, legal and constitutional issues raised by this data request, one issue has barely been part of the public discussion: national security."   Michael Chertoff, *Trump's Voter Data Request Poses an Unnoticed Danger*, Wash. Post (July 5, 2017), https://www.washingtonpost.com/opinions/trumps-voter-data-request-poses-an-unnoticed-danger--to-national-security/2017/07/05/470efce0-60c9-11e7-8adc-fea80e32bf47_story.html?utm_term=.47ed19183852.

63.     On July 5, 2017, a planned July 19, 2017 in-person meeting of the Pence-Kobach Commission was noticed in the Federal Register, 14 days prior to the scheduled meeting.   The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting, 82 Fed. Reg. 31063 (July 5, 2017) [hereinafter Meeting Notice].

64.     The notice stated that the meeting would be held in the EEOB and would be available to the public only through an internet livestream.   Meeting Notice, 82 Fed. Reg. 31063.

65.     Notwithstanding the fact that the Commission has not yet had a lawful public meeting, its work has already begun.   On July 5, 2017, Vice Chair Kobach publicly declared under penalty of perjury that "information [had been] provided to [him] in [his] official capacity as Vice Chair of the Commission."   Decl. of Kris Kobach, Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, No. 17-cv-1320 (CKK) (D.D.C. July 5, 2017), ECF No. 8-1 [hereinafter Kobach Declaration].   Vice Chair Kobach did not identify what information contained in his declaration was provided to him in his capacity as Co-Chair, nor did he identify who provided the information, or in what form.

66.     Also on July 5, 2017, spokesperson for Vice President Pence, Marc Lotter, stated that the Pence-Kobach Commission had already formulated plans for the voter data that it is collecting, explaining that the Commission intended to check the information contained in state voter rolls against data housed in various federal databases to identify supposedly ineligible registrants.   That determination was made before any lawful meetings of the Pence-Kobach Commission had been held.   Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), https://www.propublica.org/article/election-experts-see-flaws-trump-voter-commissions-plan-to-smoke-out-fraud.        Mr. Lotter would not specify which federal databases the Commission intended to use, but public reports from June 27, 2017 indicated that the Commission intended to compare state voter roll data against the federal database of non-citizens, which would lead to numerous false positive matches.  *Id.* (citing Boyer, *Voter Fraud and Suppression*).

67.     Election administration experts have stated that running such a comparison is certain to lead to numerous false positives due to minor inaccuracies on the voter rolls, inconsistencies in data collection and formatting, and the reality of common names and birthdays.  *See id.*; Maggie Koerth-Baker, *Trump's Voter Fraud Commission is Facing a Tough Data Challenge*, FiveThirtyEight, July 7, 2017, https://fivethirtyeight.com/features/trumps-voter-fraud-commission-is-facing-a-tough-data-challenge/.

68.     Indeed, Secretary Kobach currently operates an "Interstate Crosscheck" system, which purports to compare voter registration files in multiple states to search for double voters.  But a team of researchers from Stanford, Harvard, the University of Pennsylvania, and Microsoft concluded that, if Secretary Kobach's Crosscheck system were used for voter list maintenance in one state (Iowa), 99.5% of the purported matches would be false positives, such

that "200 legitimate voters may be impeded from voting for every double vote stopped." *See* Sharad Goel et al., One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections, (Jan. 13, 2017), https://5harad.com/papers/1p1v.pdf.

69.     On July 5, 2017, Plaintiffs requested that the Pence-Kobach Commission produce or make available for public inspection and copying all materials "which were made available to or prepared for or by" the Commission.  As of the date of this Complaint, Plaintiffs have not received a response to this request.

70.     Defendants continue to disclaim that the Pence-Kobach Commission is subject to FACA.  Memorandum in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order at 12, Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, No. 17-cv-1320 (CKK) (D.D.C. July 5, 2017), ECF No. 8.

## **CLAIMS FOR RELIEF**

71.     District courts are authorized to issue relief in the nature of mandamus compelling federal officials to perform ministerial or nondiscretionary duties.  28 U.S.C. § 1361.  Ministerial or nondiscretionary duties are those "so plainly prescribed as to be free from doubt and equivalent to a positive command."  *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218 (1930).

72.     All of the duties mandated by FACA, as described in paragraphs 12-13 and 16-18, above, are "equivalent to a positive command," each using the word "shall" to lay out a mandatory duty.  *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 43 (D.D.C. 2002) ("by virtue of the use of the word shall, Congress has made [the duty] nondiscretionary").

73.     Where statutory duties are violated, courts may also act pursuant to the Declaratory Judgment Act as an alternative or in addition to granting mandamus relief. *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 222 (D.D.C. 2009).

**First Claim for Relief**
**(For Relief in the Nature of Mandamus, as provided for by 28 U.S.C. § 1361,**
**Compelling Defendants Vice President Pence and the Pence-Kobach Commission to**
**Comply with their Non-Discretionary Duties of Section 10 of FACA, 5 U.S.C. app. 2 § 10)**

74.     By holding a telephonic meeting of the Pence-Kobach Commission, without providing advance notice in the Federal Register, and by not holding the meeting open to the public or providing an option for public comment, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(a)(1)-(3) of FACA.

75.     By failing to create "[d]etailed minutes" of the June 28, 2017 meeting of the Pence-Kobach Commission, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(c) of FACA.

76.     By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission for the June 28, 2017 meeting to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

77.     By failing to provide a transcript of the June 28, 2017 telephonic meeting of the Pence-Kobach Commission at the cost of duplication, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary requirements of § 11(a) of FACA.

78.     By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission since its inception, to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

79.     By failing to make available the agenda and all documents made available to and/or prepared for or by the Pence-Kobach Commission members in advance of the July 19, 2017 meeting to the public for inspection and copying, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, the Vice President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

80.     By failing to make available all documents provided to Secretary Kobach in his "official capacity as Vice-Chair of the Commission," *see* Kobach Declaration ¶ 2, to the public for "inspection and copying at a single location" within the office of the Commission, the Vice

President and the Pence-Kobach Commission have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

81.     By holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening and by not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission, the Vice-President and the Pence-Kobach Commission have failed to carry out the non-discretionary open meeting requirement of § 10(a)(1) of FACA.

**Second Claim for Relief**
**(For Relief in the Nature of Mandamus, as provided for by 28 U.S.C. § 1361,**
**Compelling Defendant President Trump to Comply with his**
**Non-Discretionary Duties of Section 5 of FACA, 5 U.S.C. app. 2 § 5)**

82.     In stacking the Commission with individuals who have already publicly supported President Trump's false statements regarding purported illegal voting, demonstrating the Pence-Kobach Commission membership is predisposed to a particular conclusion without yet having done the work to study the issues as contemplated in the Executive Order, and purportedly balancing them with members with little or no experience, President Trump has not "require[d] the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," which is a non-discretionary duty under FACA.  5 U.S.C. app. 2 § 5(b)(2).

83.     In appointing Secretary of State Kobach, who publicly affirmed President Trump's claims of voter fraud without evidence, as co-chair of the Commission, President Trump has not made "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority" which is a non-discretionary duty under FACA.  5 U.S.C. app. 2 § 5(b)(3).

84.     In appointing members von Spakovsky, Blackwell, Gardner, and McCormick, President Trump has not made "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority," which is a non-discretionary duty under FACA.  5 U.S.C. app. 2 § 5(b)(3).  Commissioners von Spakovsky and Blackwell have each publicly affirmed the existence of massive numbers of "illegal votes," in line with the narrative of President Trump in the creation of the Pence-Kobach Commission.  Commissioner Gardner has likewise made unfounded claims about illegal voting, and Commissioner McCormick has supported policies and practices that have disenfranchised voters.

**Third Claim for Relief**
**(For Declaratory Judgment, as provided for by 28 U.S.C. § 2201-02,**
**that Defendants Are in Violation of FACA, 5 U.S.C. §§ 5, 10)**

85.     All meetings of the Pence-Kobach Commission, including those conducted through an electronic medium, must be open to the public; by conducting a telephonic meeting on June 28, 2017, without public access, Vice President Pence and the Pence-Kobach Commission violated § 10(a)(1), (3) of FACA.

86.     All meetings of the Pence-Kobach Commission must be noticed in advance in the Federal Register; by conducting a telephonic meeting on June 28, 2017, without public access, Vice President Pence and the Pence-Kobach Commission violated § 10(a)(2) of FACA.

87.     By failing to create "[d]etailed minutes" of the June 28, 2017 meeting of the Pence-Kobach Commission, the Vice President and the Pence-Kobach Commission violated § 10(c) of FACA.

88.     By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made

available to or prepared for or by" the Pence-Kobach Commission—including those documents related to the June 28, 2017 telephonic meeting, related to the planned July 19, 2017 meeting, made available to Vice Chair Kobach in his "official capacity as Vice-Chair of the Commission," and all other Commission documents—to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, the Vice President and the Pence-Kobach Commission violate § 10(b) of FACA.

89.     By not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission, and ensuring this is the case by holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening and notice of individual attendance, the Vice-President and the Pence-Kobach Commission violate § 10(a)(1) of FACA.

90.     By appointing commissioners who have already publicly supported President Trump's conclusion regarding purported illegal voting, demonstrating the Pence-Kobach Commission membership is predisposed to a particular conclusion without yet having done the work to study the issues as contemplated in the Executive Order, and purportedly balancing them with members having little or no experience or knowledge about the subject matter, and who have never held similarly high political offices, President Trump has not "require[d] the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," in violation of § 5(b)(2).

91.     By failing to make any "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," President Trump has violated § 5(b)(3) of FACA.

92.     Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the foregoing conduct violates FACA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Grant relief in the nature of mandamus compelling Defendants to perform all nondiscretionary duties required by FACA, including:

    a.  requiring that Vice President Pence and the Pence-Kobach Commission hold all meetings of the Commission, including meetings conducted by telephone or other electronic medium, open to the public.  5 U.S.C. app. 2 § 10(a)(1);

    b.  requiring that Vice President Pence and the Pence-Kobach Commission publish timely notice in the Federal Register of every meeting of the Pence-Kobach Commission.  5 U.S.C. app. 2 § 10(a)(2);

    c.  requiring that the Pence-Kobach Commission keep "[d]etailed minutes" of each meeting.  5 U.S.C. app. 2 § 10(c);

    d.  requiring that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [the Pence-Kobach Commission] shall be available for public inspection and copying."  5 U.S.C. app. 2 § 10(b);

e.   requiring that the Pence-Kobach Commission "make available to any person, at actual cost of duplication, copies of transcripts" of each meeting and proceeding. 5 U.S.C. app. 2 § 11(a);

f.   requiring that President Trump "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2);

g.   requiring that President Trump make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. app. 2 § 5(b)(3).

(2) Declare that the Defendants have violated §§ 5 and 10 of FACA, including:

a.   that Vice President Pence and the Pence-Kobach Commission violated § 10(a)(1), (3) of FACA by holding the June 28, 2017 meeting of the Pence-Kobach Commission;

b.   that Vice President Pence and the Pence-Kobach Commission violated § 10(a)(2) of FACA by holding the June 28, 2017 meeting of the Pence-Kobach Commission without first publishing advance notice in the Federal Register;

c.   that the Vice President and the Pence-Kobach Commission violated § 10(c) of FACA by failing to create "detailed minutes" of the June 28, 2017 meeting of the Pence-Kobach Commission;

d.   that the Vice President and the Pence-Kobach Commission violate § 10(b) of FACA by failing to make available all the Pence-Kobach Commission

documents—including those documents related to the June 28, 2017 telephonic meeting, related to the planned July 19, 2017 meeting, made available to Vice Chair Kobach in his "official capacity as Vice-Chair of the Commission," and all other Commission documents—to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access;

e. that the Vice-President and the Pence-Kobach Commission violate § 10(a)(1) of FACA by not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission, and ensuring this is the case by holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening and notice of individual attendance;

f. that President Trump has violated § 5(b)(2) of FACA by failing to "require the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;" and

g. that President Trump has violated § 5(b)(3) of FACA by not making any provision "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment.

(3) Grant any other relief, including injunctive relief, that the Court may deem just and

proper.

Respectfully submitted,

*/s/ Dale E. Ho*
Dale E. Ho (D.C. Bar No. NY0142)
Theresa J. Lee**
Sophia Lin Lakin**
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2686
dho@aclu.org
tlee@aclu.org
slakin@aclu.org
***pro hac vice* application forthcoming

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
  of the District of Columbia
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
Tel.: 202-457-0800
aspitzer@acludc.org

Dated:   July 10, 2017