UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　v.<br><br>DONALD TRUMP, *et al.*,<br><br>　　　　*Defendants*. | Civil Action No. 17-1351 (CKK) |

**MEMORANDUM OPINION**
(July 18, 2017)

This case arises from the establishment by Executive Order of the Presidential Advisory Commission on Election Integrity (the "Commission"). Plaintiffs allege that the Commission is an advisory committee subject to the disclosure, notice, and reporting requirements of the Federal Advisory Committee Act, codified at 5 U.S.C. app. 2 ("FACA"). Pending before the Court is Plaintiffs' [3] Motion for Temporary Restraining Order and Preliminary Injunction. That motion seeks an order requiring the Commission, "in advance of the Commission's planned July 19 meeting, to: (1) ensure that any telephonic meetings held by the Commission comply with the notice and public access requirements of FACA; (2) make available for public inspection and copying at a single, [publicly] accessible location all minutes, agendas, reports, studies and documentary material made available to or prepared for or by Commission members; and (3) provide physical access to the July 19 meeting by moving it, with public notice, to a [publicly] accessible location." Pls.' Mem. at 4–5. The only jurisdictional basis pursued by Plaintiffs is in the form of mandamus. Because the Court concludes that mandamus jurisdiction is unavailable in this case at the present time, Plaintiffs' motion must be denied. Accordingly,

1

upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, Plaintiffs' [3] Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.[2]

## I. BACKGROUND

### A. Statutory Background

FACA imposes a number of procedural requirements on "advisory committees," which are defined to include "any committee . . . which is . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President . . . ." 5 U.S.C. app. 2 § 3(2). The statute exempts "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government . . . ." *Id*. FACA was enacted out of

> a desire to assess the need for the numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government. . . . Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445–46 (1989) (internal quotation marks and citations omitted).

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Mem. in Supp. of Mot. for TRO and Prelim. Inj., ECF No. 3 ("Pls.' Mem.");
- Defs.' Mem. in Opp'n to Pls.' Mot. for TRO and Prelim. Inj., ECF No. 16 ("Opp'n Mem.");
- Pls.' Reply Mem. in Supp. of Mot. for TRO and Prelim. Inj., ECF No. 17 ("Reply Mem.").

[2] Plaintiffs have consented to the contemporaneous adjudication of both their motion for a temporary restraining order and their motion for a preliminary injunction.

To achieve that purpose, FACA requires that an advisory committee, *inter alia*, file a charter before meeting or taking any action, 5 U.S.C. app. 2 § 9(c), hold its meetings "open to the public," *id*. § 10(a)(1), publish "timely notice" of each such meeting in the Federal Register, *id*. § 10(a)(2), keep minutes and other records of its meetings, *id*. § 10(c), and allow "interested persons . . . to attend, appear before, or file statements with" the committee, *id*. § 10(a)(3). FACA also mandates that, unless an exception applies under the Freedom of Information Act ("FOIA"), "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying . . . ." *Id.* § 10(b). Finally, FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

### B. Factual Background

The Commission was established by Executive Order on May 11, 2017. Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Exec. Order"). According to the Executive Order, the Commission's purpose is to "study the registration and voting processes used in Federal elections." *Id*. § 3. The Executive Order states the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas related to "voting processes" in Federal elections. *Id*. §§ 3, 6. The Vice President is the chair of the Commission, and the President may appoint 15 additional members. From this group, the Vice President is permitted to appoint a Vice Chair of the Commission. On the same day the Commission was established, Kris W. Kobach, Secretary

of State for Kansas, was named Vice Chair. Compl. ¶ 31; Decl. of Kris Kobach, *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1320 (D.D.C. July 3, 2017) ("*EPIC*"), ECF No. 8-1, at 1.

Apart from the Vice President and the Vice Chair, there are presently ten other members of the Commission, including Commissioner Christy McCormick of the Election Assistance Commission (the "EAC"), who is currently the only federal agency official serving on the Commission, and a number of state election officials, both Democratic and Republican, and a Senior Legal Fellow of the Heritage Foundation. Decl. of Andrew J. Kossack, ECF No. 16-1 ("Kossack Decl."), ¶ 1. According to Defendants, "McCormick is not serving in her official capacity as a member of the EAC." *EPIC*, Second Decl. of Kris W. Kobach, ECF No. 11-1, at 2. The Executive Order also provides that the General Services Administration ("GSA"), a federal agency, will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall endeavor to cooperate with the Commission." Exec. Order, §§ 7(a), (b). Furthermore, the Administrator of General Services—the agency head of the GSA—is charged with performing "any functions of the President under [FACA], except for those in section 6[,]" to the extent that FACA applies to the Commission. *Id.* § 7(c).

The Commission filed a charter on June 23, 2017. *See* Charter, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/commission-charter.pdf (last accessed on July 18, 2017). In pertinent part, the Charter provides that the Commission "will function solely as an advisory body," *id.* ¶ 4; that the Commission is established in accordance with the Executive Order "and the provisions of the Federal Advisory

4

Committee Act," *id.* ¶ 2; and that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission[,]" *id.* ¶ 6. Defendants represent that the Commission is voluntarily complying with FACA. Kossack Decl. ¶ 2.

On June 28, 2017, the Vice President held a teleconference with members of the Commission, during which the Vice Chair discussed his intention to send letters to state election officials requesting certain information on registered voters. Compl. ¶¶ 52, 56. There is no evidence in the record that advance notice of this teleconference was provided by the Commission, or that it was accessible to the public, but a "readout" of the call has been made publicly available, which describes the event as an "organizational call" and states that the Commission "set July 19 as its first meeting, which will take place in Washington, D.C." *Id.* ¶¶ 52, 54; *see* Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity, *available at* https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election (last accessed on July 18, 2017). According to Defendants, the teleconference was merely a preliminarily, organizational call, and members were expressly advised that the conversation "would be limited to preparatory and administrative work, and would not address matters on which the Commission was charged with advice and recommendations." Kossack Decl. ¶ 4 (citing Ex. A). Furthermore, although "[t]he Vice Chair and staff described the request, . . . members were not given a copy of any requests in advance of the call and did not see the request until shortly before it was sent to states." *Id.* ¶ 5. The request was, however, discussed for several minutes, and although members did not vote on whether to send the request or any other matter, the

"request was modified in response to some of [their] comments." *Id*.

Subsequently, on June 29, 2017, the Vice Chair directed that identical letters "be sent to the secretaries of state or chief election officers of each of the fifty states and the District of Columbia." *EPIC*, Decl. of Kris Kobach, ECF No. 8-1, at 2. In addition to soliciting the views of state officials on certain election matters by way of seven broad policy questions, each of the letters requests that state officials provide the Commission with the "publicly available voter roll data" of their respective states, "including, if publicly available under the laws of [their] state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id.*, Ex. 3 (June 28, 2017 Letter to the Honorable John Merrill, Secretary of State of Alabama). A substantial number of states have either fully or partially declined to comply with the Commission's request for voter roll data—the exact number and the specific details of the states' responses are unknown to the Court and are not relevant to the disposition of the pending motion. Without doubt, however, substantial public attention has been focused on the Commission's request for voter roll information. *See, e.g.,* Compl. ¶ 61.

On July 5, 2017, a meeting notice was published in the Federal Register indicating that the "first Commission meeting will be held on Wednesday, July 19, 2017, from 11:00 a.m., Eastern Daylight Time (EDT) until no later than 5:00 p.m., EDT." 82 Fed. Reg. 31063 (July 5, 2017). The notice appears to have been published by the GSA, and under the

section entitled "Agency," both the GSA, and the Office of Government-wide Policy ("OGP"), a component of the GSA, are listed. Furthermore, the notice states that the Commission is "a Federal Advisory Committee established in accordance with the Federal Advisory Committee Act . . . ." The notice further provides that the July 19 meeting "will be open to the public through livestreaming on https://www.whitehouse.gov/live," which is the "same livestreaming system regularly used by the White House to stream White House press briefings, speeches by the President and Vice President, and other events with significant viewership." Kossack Decl. ¶ 7. The notice states that individuals may submit written comments to the Commission via email in advance of the meeting, and that the meeting "will consist of a ceremonial swearing in of Commission members, introductions and statements from members, a discussion of the Commission's charge and objectives, possible comments or presentations from invited experts, and a discussion of next steps and related matters." Although the notice indicates that there "will not be oral comments from the public at th[e] initial meeting[,]" it adds that "[t]he Commission will provide individuals interested in providing oral comments the opportunity to do so at subsequent meetings." According to Defendants, members of the general public will be excluded from the July 19 meeting due to security concerns posed by the attendance of the Vice President, but "a number of accredited members of the White House press corps will be invited to attend in person," as space permits. Kossack Decl. ¶ 8.

In a submission to this Court, Defendants have represented that the Commission intends to "publish to a public webpage all documents which were made available to or prepared for or by the Commission, in accordance with FACA." *Id.* ¶ 2. Furthermore, prior to the July 19 meeting, the Commission will post to its website the agenda of the meeting,

"public comments received through the Commission's staff email account within a reasonable time in advance of the meeting, and other documents that are prepared for or by the Commission." *Id.* ¶ 10.[3] The Commission has received over 30,000 public comments via the Commissions' email address. *Id.*

On July 5, 2017, Plaintiffs submitted a request for the Commission's records pursuant to section 10(b) of FACA. Plaintiffs requested that the Commission "produce or make available for public inspection and copying all materials which were made available to or prepared for or by the Commission." Compl. ¶ 69 (internal quotation marks omitted). Defendants concede that they did not respond directly to the request before this suit was filed. Kossack Decl. ¶ 3.

## II. LEGAL STANDARD

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original; quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and

---

[3] The Court has reviewed the website for the Commission, and it currently contains an agenda for the July 19 meeting, proposed bylaws that are to be discussed at the meeting, and a substantial number of public comments.

[4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis,* 571 F.3d at 1291 (citation omitted). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.[4]

### III. DISCUSSION

The only basis for subject-matter jurisdiction pursued by Plaintiffs in connection with the pending motion is 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In this case, that relief would be an injunction in the form of mandamus requiring

---

[4] The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that the pending motion must be denied for lack of subject-matter jurisdiction.

Defendants to comply with FACA. Plaintiffs have conceded, for purposes of this motion, that "mandamus relief compelling the . . . Commission to comply with the non-discretionary duties of FACA is the only remedy available to [Plaintiffs]." Reply Mem. at 5. In so doing, Plaintiffs have taken the position that "FACA itself does not contain a private right of action," and that judicial review is unavailable pursuant to the Administrative Procedure Act ("APA") because "none of the Defendants named in the ACLU's complaint are agencies within the scope of the APA." *Id*. at 6.

Mandamus is a "drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (internal quotation marks omitted; citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). These requirements are jurisdictional. *Id*. Even when these requirements are met, however, "a court may grant relief only when it finds compelling equitable grounds. . . . The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Id*. (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Mandamus jurisdiction is not presently available in this case, and consequently, the pending motion for injunctive relief must be denied for lack of subject-matter jurisdiction. First, despite the positions taken by Plaintiffs in this matter, the Court does not conclude that there is no "adequate alternative remedy," because it has not yet ruled out the availability of judicial review pursuant to the APA. *See Lawyers' Committee for Civil*

*Rights Under the Law v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1354 (D.D.C. July 10, 2017) ("*Lawyers' Committee*"), Mem. Op., ECF No. 17, at 16. True, Plaintiffs have chosen not to add certain agency parties as Defendants to this litigation—but a plaintiff's decision not to pursue a particular remedy plainly does not establish that it has "no adequate alternative remedy."

Second, the provisions of FACA sought to be enforced do not provide a "clear and indisputable right" to the prospective injunctive relief sought by Plaintiffs in the pending motion. Namely, they do not require that the Commission, *prior to* the July 19 meeting, "make available for public inspection and copying at a single, [publicly] accessible location *all* minutes, agendas, reports, studies and documentary material made available to or prepared for or by Commission members;" and that the Commission "provide *physical* access to the July 19 meeting . . . ." Pls.' Mem. at 4–5 (emphasis added). Nor is it evident that Defendants are "violating a clear duty to act" with respect to these sections; rather, Defendants appear, at least for the time being, to be in compliance with the statutory text of FACA, and the pertinent regulations promulgated by the GSA.

All told, Plaintiffs seek injunctive relief on the basis of four FACA provisions: section 10(a)(1) mandates that "[e]ach advisory committee meeting shall be open to the public"; section 10(a)(2) mandates that "timely notice of each such meeting shall be published in the Federal Register"; section 10(a)(3) mandates that "[i]nterested persons shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator may prescribe"; and section 10(b) mandates that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or

prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist."

However, section 10(a)(1) does not prescribe the manner in which advisory committee meetings are supposed to be "open to the public." Defendants have provided for public viewing of the July 19 meeting through a livestreaming service used by the White House for events with substantial viewership, such as official press briefings and speeches by the President and the Vice President. *Supra* at 7. Furthermore, Defendants have published notice with respect to the July 19 meeting, *supra* at 6, meaning the requirements of section 10(a)(2) have been satisfied as to that meeting—or, at the very least, have not clearly been violated. And section 10(a)(3) does not require that interested persons be permitted to attend *each* advisory committee meeting, nor does it even seem to require that an advisory committee provide an opportunity for in-person attendance at all, if interested persons are permitted to "file statements" with the committee. *See Holy Cross Neighborhood v. Julich*, 106 F. Supp. 2d 876, 887 (E.D. La. 2000) (noting "Congress' use of the disjunctive: the Plaintiffs do not have the right to attend, appear before *and* file statements"). Here, the Commission has permitted interested persons to submit written comments in advance of the meeting, and has stated that it "will provide individuals interested in providing oral comments the opportunity to do so at subsequent meetings[,]" presumably where the security concerns posed by the attendance of the Vice President are not present. *Supra* at 7. Consequently, sections 10(a)(1), (2), and (3) do not appear to require Defendants to do anything more to comply with FACA in connection with the July 19 meeting than what they have already done, and consequently, Plaintiffs do not have a

"a clear and indisputable right to relief" pursuant to those sections, nor have those sections been clearly violated by Defendants' conduct to date.

This conclusion is buoyed by a review of pertinent regulations promulgated by the GSA elaborating on how federal advisory committees are expected to comply with FACA. *See generally* 41 C.F.R., part 102-3 ("Federal Advisory Committee Management"). These regulations do not necessarily carry the force of law, but they are at very least instructive because the GSA is "the agency responsible for administering FACA . . . ." *Pub. Citizen*, 491 U.S. at 465 n.12 (citing 5 U.S.C. App. § 7(c), which authorizes the GSA to "prescribe administrative guidelines and management controls applicable to advisory committees . . . ."). Moreover, section 10(a)(3) specifically subjects the right of "persons . . . to attend, appear before, or file statements with any advisory committee, . . . to such reasonable rules or regulations as the Administrator [of the GSA] may prescribe." With respect to the open meetings requirement of section 10(a)(1), the pertinent regulations require only that an advisory committee meeting be "held at a reasonable time and in a manner *or* place reasonably accessible to the public," that the "meeting room or *other forum* selected is sufficient to accommodate . . . a reasonable number of interested members of the public," and that any "advisory committee meeting conducted in whole or part by a teleconference, videoconference, the Internet, or other electronic medium [must meet] the requirements of this subpart." 41 C.F.R. § 102-3.140 (emphasis added). Consequently, the regulations anticipate that some advisory committee meetings will be made publicly accessible via internet access, and that this is permissible so long as this method is "reasonably accessible to the public," and can accommodate "a reasonable number of interested members of the public." *Id*. Based on Defendants' representations, the livestreaming service offered for the

July 19 meeting appears likely to satisfy both of these requirements, and indeed will offer more members of the public the opportunity to observe proceedings than had only physical access been permitted.

Plaintiffs have argued, in essence, that Defendants are violating these regulations because the meeting is being held in-person, while public access is being provided via the internet. Reply Mem. at 16. The Court does not read the statute or regulations so narrowly. For example, the regulations provide that each "advisory committee meeting [must be] held at a reasonable time and in a manner or place reasonably accessible to the public . . . ." 41 C.F.R. § 102-3.140(a). This only requires that the "manner" *or* "place" be reasonably accessible to the public, not both. Furthermore, the regulations seem to anticipate that meetings may be held in a mixed medium, as they provide for an "advisory committee meeting [to be] conducted in whole *or part* by a teleconference . . . ." *Id*. § 102-3.140(e) (emphasis added). Finally, it must be remembered that the statutory mandate only requires generally that each "advisory committee meeting shall be open to the public." 5 U.S.C. app. 2 § 10(a)(1). No particular mode of access is specified.

With respect to the requirements of section 10(a)(3), the pertinent regulations, like the statutory text, do not require that interested persons be permitted to provide oral comments at *every* advisory committee meeting. *See id*. § 102-3.140(d) ("[a]ny member of the public may speak to or otherwise address the advisory committee if the agency's guidelines so permit"). Accordingly, the Court finds that Plaintiffs have failed to demonstrate that Defendants' arrangements for the July 19 meeting are clearly violative of sections 10(a)(1) or 10(a)(3) of FACA; rather, it appears that Defendants have, at least for the time being, complied with those sections and the pertinent GSA regulations.

Finally, although Plaintiffs allege that Defendants violated the prior notice requirement of section 10(a)(2) with respect to the July 28 teleconference, that violation is not so clear as to warrant mandamus relief at this time, given the substantial debate over whether the meeting was exempt from FACA as purely "administrative" or "preparatory" work pursuant to 41 C.F.R. § 102-3.160. Even if mandamus jurisdiction were available, however, Defendants' alleged "failure to provide notice and public access" for the July 28 teleconference is not a basis for the prospective injunctive relief sought by Plaintiffs. *See* Reply Mem. at 16; Opp'n Mem. at 20.

Turning to the section 10(b) claim, Plaintiffs have requested the disclosure, prior to the July 19 meeting of "all minutes, agendas, reports, studies and documentary material made available to and/or prepared for or by Commission members." Pls.' Mem. at 5. Section 10(b) itself contains no deadline by which advisory committee materials must be made "available for public inspection and copying . . . ." However, in *Food Chemical*, the D.C. Circuit instructed that, pursuant to section 10(b), "whenever practicable, parties [should] have access to the relevant materials before or at the meeting at which the materials are used and discussed, [because opening] meetings to the public would be meaningless if the public could not follow the substance of the discussions." *Food Chem.*, 980 F.2d at 1472. Here, Defendants represent that because the July 19 meeting "is an initial meeting where the commissioners will introduce themselves and discuss the general direction for the Commission's work, there are few documents that pertain to the meeting." Kossack Decl. ¶ 10. Nonetheless, Defendants, in a declaration submitted to the Court under penalty of perjury, have represented that prior to the July 19 meeting, they will make publicly available: (i) the agenda for the meeting; (ii) public comments received by the

15

Commission via its email account within a reasonable time in advance of the meeting; and (iii) "other documents that are prepared for or by the Commission." *Id*. Documents "prepared for or by the Commission" invariably must include documents that will be "used and discussed" at the July 19 meeting. Accordingly, Defendants have satisfied their obligation under *Food Chemical* "to release those materials before or on the date of the advisory committee meeting for which those materials were prepared," *Food Chem.*, 980 F.2d at 1472. Plaintiffs have consequently failed to show that they has a "clear and indisputable right to relief" under section 10(b) at this time, or that Defendants are presently in clear violation of that right.

To make clear, the Court does not conclude that mandamus relief may never be appropriate for alleged FACA violations. Other district courts have found, in different legal and factual circumstances, that such relief may indeed be available. *See, e.g., Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32 (D.D.C. 2011); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010). The Court merely concludes that, given the factual and legal circumstances of this case, it lacks jurisdiction to confer relief in the form of mandamus at the present time. Because that is the only jurisdictional basis pursued by Plaintiff, its motion for preliminary injunctive relief must be denied.[5] And even were the Court to reach the preliminary injunction factors, it would conclude that injunctive relief is presently unavailable to Plaintiffs, for reasons stated in the Memorandum Opinion filed recently in *Lawyers' Committee*, ECF No. 17, 15–24.

---

[5] Although Plaintiffs have indicated that they may amend their complaint to pursue other jurisdictional bases, Reply Mem. at 6, no amendment has been filed on the public docket, and it is "axiomatic" that a party may not amend their complaint via their briefing. *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014).

## IV. CONCLUSION

Accordingly, for all of the foregoing reasons, Plaintiffs' [3] Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.

An appropriate Order accompanies this Memorandum Opinion.

Dated: July 18, 2017

>                   /s/
> COLLEEN KOLLAR-KOTELLY
> United States District Judge