**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, Inc., | ) | |
| AMERICAN CIVIL LIBERTIES UNION | ) | |
| FOUNDATION, Inc., | ) | |
|     125 Broad Street, 18th Floor | ) | |
|     New York, NY 10004 | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01351 (CKK) |
| | ) | |
| DONALD TRUMP, in his official capacity | ) | |
| as President of the United States, | ) | |
|     1600 Pennsylvania Avenue NW | ) | |
|     Washington, DC 20500, | ) | |
| | ) | |
| MICHAEL PENCE, in his official capacity | ) | |
| as Vice President of the United States | ) | |
| and chair of the Presidential Advisory | ) | |
| Commission on Election Integrity, | ) | |
|     Eisenhower Executive Office Building | ) | |
|     1650 Pennsylvania Avenue NW | ) | |
|     Washington, DC 20502, | ) | |
| | ) | |
| PRESIDENTIAL ADVISORY | ) | |
| COMMISSION ON ELECTION INTEGRITY, | ) | |
| an advisory committee commissioned | ) | |
| by President Donald Trump, | ) | |
|     Eisenhower Executive Office Building | ) | |
|     1650 Pennsylvania Avenue NW | ) | |
|     Washington, DC 20502, | ) | |
| | ) | |
| TIMOTHY HORNE, in his official capacity | ) | |
| as Acting Administrator of the General | ) | |
| Services Administration, | ) | |
|     1800 F Street, NW | ) | |
|     Washington, DC, 20405, | ) | |
| | ) | |
| *caption continued on next page* | ) | |

M. VIRGINIA WILLS, in her official capacity )
as Committee Management Officer of the )
Presidential Advisory Commission on )
Election Integrity, )
     1800 F Street, NW )
     Washington, DC, 20405, )
      )
GENERAL SERVICES ADMINISTRATION, )
     1800 F Street, NW )
     Washington, DC, 20405, )
      )
     Defendants. )
_____)

# AMENDED COMPLAINT FOR
## DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (together, the "ACLU") bring this action against Donald Trump, in his official capacity as President of the United States ("President Trump"), Michael Pence, in his official capacity as Vice President of the United States and Chair of the Presidential Advisory Commission on Election Integrity ("Vice President Pence"), the Presidential Advisory Commission on Election Integrity ("Pence-Kobach Commission"), Timothy Horne, in his official capacity as Acting Administrator of the General Services Administration, M. Virginia Wills, in her official capacity as Committee Management Officer ("CMO") of the Presidential Advisory Commission on Election Integrity, and the General Services Administration ("GSA"), a federal agency (collectively, "Defendants"), seeking declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 and because Defendants are acting ultra vires, and in the alternative, relief in the nature of mandamus compelling Defendants to comply with the nondiscretionary requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, and a declaration that Defendants have violated FACA.

Defendants have violated FACA in two respects.  *First*, Defendants have already violated, and absent relief, will continue to violate the non-discretionary transparency and public access requirements of § 10 of FACA, 5 U.S.C. app. 2 § 10.  The Pence-Kobach Commission held its first meeting without public notice; without making that meeting open to the public; and without timely notice in the Federal Register, *id.* § 10(a).  It has also failed to make all of its "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission "available for public inspection," *id.* § 10(b).  The second meeting of the Pence-Kobach Commission was held in a building generally inaccessible to the public, and only a limited subset of the documents already relied upon by the Commission have been made available to the public, contrary to the earlier representations by the Commission's Designated Federal Officer that all documents prepared for the second meeting would be posted on the Commission's hastily created website prior to that meeting.

*Second*, Defendants have violated requirements under § 5 of FACA, 5 U.S.C. app. 2 § 5, that an advisory committee's membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," *id.* § 5(b)(2); and that "appropriate provisions" be made "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[,]" *id.* § 5(b)(3).  The Pence-Kobach Commission's stated purpose is to "study the registration and voting processes used in Federal elections" and "submit a report to the President" on related "laws, rules, policies, activities, strategies, and practices."  Exec. Order No. 13,799, § 3, 82 Fed. Reg. 22389 (May 11, 2017).  But, in fact, the Commission was

established for the purpose of providing a veneer of legitimacy to President Trump's false claim that he won the popular vote in the 2016 election—once millions of supposedly illegal votes are subtracted from the count.  That purpose is evident in the composition of the Commission, which is stacked with individuals who have endorsed the President's false statements about the popular vote, and the fact that no provisions whatsoever have been made to insulate the Commission's advice and recommendations from inappropriate influence by the person who appointed the Commission's members—*i.e.*, President Trump himself—or from particular special interests.

Defendants have also violated the APA both by acting arbitrarily and outside the legal authority of the Commission, and through the various failures to comply with FACA, which all constitute final agency action.  Likewise, apart from the statutory framework of the APA, each authority of the government can act only as provided by the Constitution or to the extent Congress has prescribed their "power to act and how they are to act." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013).  Any other exercise of authority is void as ultra vires.  By conducting activities outside the scope of authority provided for in the Executive Order and Commission Charter, and by failing to comply with the limitations of FACA, Defendants have acted ultra vires.

### THE PARTIES

1.      Plaintiff American Civil Liberties Union is a 501(c)(4) non-profit, nationwide, non-partisan membership organization with approximately 1.6 million members, many of whom are registered voters.  The ACLU is dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including laws protecting access to the right to vote.

2.      Plaintiff American Civil Liberties Union Foundation is a 501(c)(3) non-profit, nationwide, non-partisan organization with nearly 300 staff attorneys, thousands of volunteer attorneys, and offices throughout the nation.  Since 1965, the ACLU, through its Voting Rights Project, has litigated hundreds of voting rights cases and has a direct interest in ensuring that all eligible citizens are able to access the franchise and are not removed from voter rolls, and in empowering those targeted by vote suppression.  The ACLU regularly litigates cases in which government officials attempt to limit access to the franchise and keep eligible voters off the registration rolls, and therefore has a direct interest in the purported purpose of the Presidential Advisory Commission on Election Integrity ("Pence-Kobach Commission").

3.      Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.   In that capacity, he issued Executive Order 13,799 of May 11, 2017, establishing the Pence-Kobach Commission, and appoints the members of the Commission.

4.      Defendant Michael Pence is the Vice President of the United States.  He is sued in his official capacity.   In that capacity, Vice President Pence is the chair of the Pence-Kobach Commission.  Exec. Order No. 13,799, § 2.

5.      Defendant Presidential Advisory Commission on Election Integrity ("Pence-Kobach Commission") was established by President Trump pursuant to Executive Order 13,799, and is a presidential advisory committee.  Exec. Order No. 13,799.

6.      Defendant Timothy Horne is the Acting Administrator of the General Services Administration ("GSA").   He is sued in his official capacity.   In that capacity, under the Executive Order creating the Pence-Kobach Commission, he performs all of the functions of the President under FACA except those of § 6.  Exec. Order No. 13,799, § 7(c).  As head of the

GSA, Administrator Horne designated both the Committee Management Officer and the Designated Federal Officer of the Pence-Kobach Commission.

7.      Defendant M. Virginia Wills is the Committee Management Officer ("CMO") of the Pence-Kobach Commission and for all other advisory committees housed in the GSA.

8.      Defendant General Services Administration ("GSA") is a federal agency charged with providing the Pence-Kobach Commission "with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission."  Exec. Order No. 13,799, § 7(a).  The Commission's Designated Federal Officer has represented that the Commission's documents will be housed for public inspection at the GSA.  Kossack Decl., ¶ 10, ECF No. 16-1.  The charter of the Pence-Kobach Commission designates the GSA as the "Agency Responsible for Providing Support," and that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission . . . on a reimbursable basis."  Charter, Presidential Advisory Comm'n on Election Integrity ¶ 6, *available at* https://www.facadatabase.gov/download.aspx?fn=Charters/2612_2017.06.23_Charter-Presidential%20Commission%20on%20Election%20Integrity_(2017-06-23-06-32-07).docx [hereinafter Charter].  The GSA filed the Charter of the Pence-Kobach Commission and published each of the Commission's five notices in the Federal Register.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 701-706.  Plaintiffs also seek relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## **FACTS**

**I.     Statutory and Regulatory Framework**

11.     The Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, was enacted because of the congressional concern with the number and utility of advisory committees.  Congress found, among other things, that committees "should be established only when they are determined to be essential" and that "Congress and the public" should be kept abreast of their activities.  5 U.S.C. app. 2 § 2(b).   "FACA's principal purpose was to establish procedures aimed at enhancing public accountability of federal advisory committees."  *Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 209 F. Supp. 2d 102, 113 (D.D.C. 2002), *aff'd*, 396 F.3d 1152 (D.C. Cir. 2005); *see also Food Chem. News, Inc. v. Davis*, 378 F. Supp. 1048, 1051 (D.D.C. 1974) (purpose of FACA is "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals").

12.     FACA applies to "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President," denominating such groups as "advisory committees."  5 U.S.C. app. 2 § 3(2).

13.     Only those committees that are "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or "created by the National Academy of Sciences or the National Academy of Public Administration" fall outside the definition of "advisory committee" under the Act. 5 U.S.C. app. 2 § 3(2).  And all of the provisions of FACA apply to advisory committees except when an "Act of Congress establishing any such advisory committee specifically provides otherwise."  5 U.S.C. app. 2 § 4(a).

14.     FACA requires that in establishing an advisory committee, the President "shall" follow the guidelines of the statute, 5 U.S.C. app. 2 § 5(c), including that the directive establishing the advisory committee must, among other things, "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(2)-(3).

15.     The implementing regulations require each advisory committee to have a plan to attain fairly balanced membership.  The plan must "ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee. Advisory committees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed."  41 C.F.R. § 102-3.60(b)(3).

16.     FACA provides that the "head of each agency which has an advisory committee shall designate an Advisory Committee Management Officer who shall— (1) exercise control and supervision over the establishment, procedures, and accomplishments of advisory committees established by that agency; (2) assemble and maintain the reports, records, and other papers of any such committee during its existence; and (3) carry out, on behalf of that agency, the provisions of section 552 of title 5, United States Code, with respect to such reports, records, and other papers."  5 U.S.C. app. 2 § 8(b).

17.     In addition to the duties specified in 5 U.S.C. app. 2 § 8(b), the CMO "will carry out all responsibilities delegated by the agency head" and "ensure that sections 10(b), 12(a), and 13 of [FACA] are implemented by the agency to provide for appropriate recordkeeping."   41 C.F.R. § 102-3.115.

18.     The charter of each advisory committee must be filed by the "the Committee Management Officer (CMO) designated in accordance with section 8(b) of the Act, or . . . another agency official designated by the agency head."  41 C.F.R. § 102-3.70.

19.     Each advisory committee has a Designated Federal Officer ("DFO") that must be designated by the agency head or "in the case of an independent Presidential advisory committee, the Secretariat."  41 C.F.R. § 102-3.120.

20.     The agency head that "establishes or utilizes one or more advisory committees" must designate both the CMO and the DFO.  41 C.F.R. § 102-3.105.

21.     FACA further provides that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed."  5 U.S.C. app. 2 § 9(c).

22.     FACA demands transparency in the procedures and meetings of advisory committees.  All advisory committee meetings must be open to the public and must be timely noticed in the Federal Register.  5 U.S.C. app. 2 § 10(a)(1)-(2).  Interested members of the public must "be permitted to attend, appear before, or file statements with any advisory committee," subject only to "reasonable" regulations set by the Administrator of General Services.  *Id.* § 10(a)(3).  Although portions of meetings may be closed where the President determines that closure is provided for pursuant to 5 U.S.C. § 552b(c) (the federal Open Meetings statute), any such determination must be made in writing and set forth the reasons for the conclusion. 5 U.S.C. app. 2 § 10(d).

23.    Advisory committee meetings must be noticed in the Federal Register at least fifteen days before the meeting is to be held.  41 C.F.R. § 102-3.150(a).

24.    Each advisory committee meeting must be "held at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." 41 C.F.R. § 102-3.140(a)-(b).

25.    If an advisory committee meeting is held via teleconference, videoconference, or other electronic medium, it still must be made accessible to the public. 41 C.F.R. § 102-3.140(e).

26.    Subject to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports."  5 U.S.C. app. 2 § 10(b).

27.    FACA mandates that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee.  The accuracy of all minutes shall be certified to by the chairman of the advisory committee."  5 U.S.C. app. 2 § 10(c).

28.    Advisory committees must make available copies of transcripts of advisory committee meetings to "any person" at only the "actual cost of duplication."  5 U.S.C. app. 2 § 11(a).

29.    Each of the requirements of FACA is mandatory on the appointing authority, in this case, President Trump, and on the advisory committee itself.

30.     The Administrative Procedure Act governs agency action, defining "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with a number of exceptions not relevant here.  5 U.S.C. § 701(b).

## II.     The Creation of the Pence-Kobach Commission

### A.  Events Leading to the Creation of the Pence-Kobach Commission

31.     Following the 2016 Presidential Election, the official results of the popular vote indicated that 65,853,516 votes were cast for Democratic nominee, Hillary Rodham Clinton, and 62,984,825 votes were cast for Republican nominee, Donald Trump, and the official results of the Electoral College indicated that 227 Electoral College votes were cast for Democratic nominee Hillary Rodham Clinton, and 304 Electoral College votes were cast for Republican nominee Donald Trump.  Federal Election Commission ("FEC"), Official 2016 Presidential General Election Results (Jan. 30, 2017), *available at* https://transition.fec.gov/pubrec/fe2016/2016presgeresults.pdf.

32.     On November 20, 2016, President Elect Trump met with Kansas Secretary of State Kris Kobach, now-Vice Chair of the Pence-Kobach Commission.  Outside that meeting, now-Vice Chair Kobach was photographed by the Associated Press with a document that appeared to reference proposed amendments to the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501-511.  *See, e.g.*, Peter Hancock, *Kobach Ordered To Turn Over Document He Used in Meeting with Trump*, Lawrence J.-World (Apr. 5, 2017), http://www2.ljworld.com/news/2017/apr/05/kobach-ordered-turn-over-document-he-used-meeting-/; *see also* Order, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. Apr. 17, 2017), ECF No. 320; Order, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. June 23, 2017), ECF No. 355.

33.    The documents laid out specific additions and deletions to the NVRA.  Ex.EE, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. Aug. 30, 2017), ECF No. 396-3; Exhibit U, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. July 24, 2017), ECF No. 373-3.

34.    In attempting to prevent the public release of these documents in July 2017, Vice Chair Kobach cited his role on the Pence-Kobach Commission, stating that the release of the documents "would undermine Secretary Kobach's interest in fulfilling his appointed duty and responsibilities on the Presidential Election Commission which include being able to advise the President privately on matters within the purview of the Commission."  Def.'s Resp. to Pls.' Mot. to Unseal at 11, *Fish v. Kobach*, No. 16-cv-2105-JAR-JPO (D. Kan. July 28, 2017), ECF No. 376.  Now-Vice Chair Kobach, however, proposed these amendments to the NVRA months before the Commission's creation, suggesting that as Vice Chair he had already determined what one recommendation of the Pence-Kobach Commission would be, prior to any study or deliberation.

35.    On November 27, 2016, President Elect Trump tweeted, "In addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally."  *See* Donald Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 12:30 PM), https://twitter.com/realDonaldTrump/status/802972944532209664.

36.    On November 30, 2016, now-Vice Chair Kobach stated, "I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton at this point."  Hunter Woodall, *Kris Kobach Agrees with Donald Trump that 'Millions' Voted Illegally But Offers No Evidence*, Kan. City Star (Nov. 30, 2016), http://www.kansascity.com/news/politics-government/article117957143.html [hereinafter Woodall, *Kris Kobach Agrees with Donald Trump*].

37.     On December 4, 2016, in response to President Trump's groundless claims concerning the popular vote, Vice President Pence stated, "I don't know that that is a false statement," and characterized President Trump as "refreshing."  *'This Week' Transcript: Vice President-Elect Mike Pence & Gen. David Petraeus*, ABC News (Dec. 4, 2016), http://abcnews.go.com/Politics/week-transcript-vice-president-elect-mike-pence-gen/story?id=43952176.

38.     President Trump has continued to assert, contrary to all available factual evidence and the findings of the FEC, that he won the popular vote.  *See, e.g.*, Charles Ventura, *Trump Revives False Claim That Illegal Ballots Cost Him Popular Vote*, USA Today (Jan. 23, 2017), https://www.usatoday.com/story/news/politics/onpolitics/2017/01/23/president-trump-illegal-ballots-popular-vote-hillary-clinton/96976246/; Aaron Blake, *Donald Trump Claims None of Those 3 to 5 Million Illegal Votes Were Cast for Him. Zero.*, Wash. Post (Jan. 26, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/01/25/donald-trump-claims-none-of-those-3-to-5-million-illegal-votes-were-cast-for-him-zero/?tid=a_inl&utm_term=.1e862115ce52.

39.     In a meeting with congressional leaders on January 24, 2017, President Trump repeated his claim that he would have won the popular vote if not for millions of votes cast by illegal voters.  *See The Latest: Trump Repeats Unproven Claim of Illegal Votes*, Associated Press (Jan. 24, 2017), https://www.apnews.com/2987214f67da4b2d8900bc995e864912.

40.     In the early morning hours of the following day, President Trump tweeted, "I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and . . . even, those registered to vote who are dead (and many for a long time).  Depending on results, we will strengthen up voting procedures!"  Donald Trump    (@realDonaldTrump),    Twitter    (Jan.    25,    2017,    7:10    AM);

https://twitter.com/realDonaldTrump/status/824227824903090176;        Donald        Trump

(@realDonaldTrump),        Twitter        (Jan.        25,        2017,        7:13        AM),

https://twitter.com/realdonaldtrump/status/824228768227217408?lang=en.

41.    That same day, in an ABC News interview, in response to questions regarding his claims that he would have won the popular vote, President Trump stated, "We're gonna launch an investigation to find out.  And then the next time—and I will say this, of those votes cast, none of 'em come to me.  None of 'em come to me.  They would all be for the other side.  None of 'em come to me."  *Transcript: ABC News Anchor Interviews President Trump*, ABC News (Jan.    25,    2017),    http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602.

42.    However, President Trump's own legal team argued that "[a]ll available evidence suggests that the 2016 general election was *not* tainted by fraud or mistake."  Donald J. Trump and Donald J. Trump for President, Inc.'s Objs. to Dr. Jill Stein's Recount Pet. at 2, In re Pet. for Recount for the Office of President of the United States of America (Mich. Bd. of State Canvassers    Dec.    1,    2016),    *available   at*    https://www.michigan.gov/documents/sos/Objection_to_Recount_Petition_544089_7.pdf.

43.    Vice President Pence attended and participated in the January 24 meeting with congressional leaders at which President Trump asserted he won the popular vote but for illegal voters.  *See The Latest: Trump Repeats Unproven Claim of Illegal Votes*, Associated Press (Jan. 24, 2017), https://www.apnews.com/2987214f67da4b2d8900bc995e864912.

44.    On or about January 26, 2017, at an annual Republican policy retreat, Vice President Pence reportedly reaffirmed, "the concern that you have, I have, the [P]resident certainly has about people being registered in multiple states."  Mike DeBonis & Sari Horwitz,

*In Private Meeting, Pence Vows 'Full Evaluation of Voting Rolls' Over Claims of Fraud*, Wash. Post (Jan. 27, 2017), https://www.washingtonpost.com/powerpost/in-private-meeting-pence-vows-fullevaluation-of-voting-rolls-over-claims-of-voting-fraud/2017/01/27/1c1fa1de-e49a-11e6-a547-5fb9411d332c_story.html?utm_term=.4a7ec39da956.

45.     On February 9, 2017, at a meeting with ten Senators on the Supreme Court nomination, President Trump asserted that he and former-Senator Kelly Ayotte would both have won New Hampshire but for "'thousands' of people who were 'brought in on buses' from neighboring Massachusetts to 'illegally' vote in New Hampshire."  Eli Stokols, *Trump Brings up Vote Fraud Again, This Time in Meeting with Senators*, Politico (Feb. 10, 2017), http://www.politico.com/story/2017/02/trump-voter-fraud-senators-meeting-234909.  No factual evidence supports that assertion.

46.     President Trump continued to assert that he would be "proved right" about his claim that millions of people voted illegally.  Ali Vitali, Peter Alexander, & Kelly O'Donnell, *Trump Establishes Voter Fraud Commission*, NBC News (May 11, 2017), https://www.nbcnews.com/politics/white-house/trump-establish-vote-fraud-commission-n757796.

B.     Composition of the Pence-Kobach Commission

47.     On May 11, 2017, President Trump issued Executive Order 13,799, establishing the Pence-Kobach Commission.  The Executive Order provides that the Commission would be chaired by the Vice President, be composed of not more than fifteen additional members selected by the President, and that the Vice President may select a vice chair from among the other members.  Exec. Order No. 13,799, § 2.

48.     The purported "[m]ission" of the Pence-Kobach Commission is to "study the registration and voting processes used in Federal elections."  Exec. Order No. 13,799, § 3.  The Commission is to "submit a report to the President that identifies . . . those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections; . . . those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of the voting processes used in Federal elections; and . . . those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting."  *Id.*

49.     Vice Chair Kobach has stated that the Commission's goal is to "for the first time, have a nationwide fact-finding effort" focused on assessing "evidence" of "different forms of voter fraud across the country." *Transcript: Trump Forms Voter Fraud Commission*, CNN (May 15, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1705/15/nday.06.html.

50.     Defendants have repeatedly touted the Pence-Kobach Commission as "bipartisan." Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission; Madeline Conway, *Kris Kobach Defends Elections Commission Voter Data Request*, Politico (July 5, 2017), http://www.politico.com/story/2017/07/05/kobach-states-voter-data-fraud-240241 (quoting Vice Chair Kobach defending the broad data request touting "this bipartisan commission").

51.     The Executive Order does not contain any provisions that "require the membership of the advisory committee to be fairly balanced in terms of the points of view

represented and the functions to be performed by the advisory committee" or to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority," 5 U.S.C. app. 2 § 5(b)(2)-(3), in this case, President Trump. *See* Exec. Order No. 13,799.

52.     On June 23, 2017, the GSA filed the charter of the Pence-Kobach Commission, *See* Kossack Decl. ¶ 2, Ex. A, ECF No. 16-1.  The filing of an advisory committee charter is a power designated to "the Committee Management Officer (CMO) designated in accordance with section 8(b) of the Act, or . . . another agency official designated by the agency head."  41 C.F.R. § 102-3.70.

53.     Like the Executive Order, the charter of the Pence-Kobach Commission does not contain any provisions that "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" or to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority," 5 U.S.C. app. 2 § 5(b)(2)-(3), in this case, President Trump.  *See* Charter.

54.     Also on May 11, 2017, President Trump named Secretary Kobach as Vice Chair of the Commission.  Press Release, Office of the Press Secretary, President Announces Formation of Bipartisan Presidential Commission on Election Integrity (May 11, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission [hereinafter "Executive Order Release"].

55.     Upon the issuance of the Executive Order, President Trump also named five additional members of the Pence-Kobach Commission: Connie Lawson, Secretary of State of Indiana; Bill Gardner, Secretary of State of New Hampshire; Matthew Dunlap, Secretary of State

of Maine; Ken Blackwell, Former Secretary of State of Ohio; and Christy McCormick, Commissioner, Election Assistance Commission ("EAC").  *See* Executive Order Release.

56.     At least four out of these six initial appointees to the Commission have a record of making exaggerated and/or baseless claims about voter fraud, and/or have implemented or supported policies that have unlawfully disenfranchised voters.

57.     Vice Chair Kobach has repeatedly made exaggerated claims about non-citizen voting.  The United States Court of Appeals for the Tenth Circuit, in a decision finding that Secretary Kobach has engaged in the "mass denial of a fundamental constitutional right," because he disenfranchised 18,000 motor-voter applicants in Kansas, found that Secretary Kobach's assertions about widespread non-citizen voting were "pure speculation."  *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016).  In the same case, Secretary Kobach was sanctioned by the magistrate judge for "deceptive conduct and lack of candor," and for making "patently misleading representations to the court" about the document that he carried into his November 20, 2016 meeting with President-elect Trump.  *Fish v. Kobach*, No. 16-cv-2105-JAR, 2017 WL 2719427, at *2-*3, *5 (D. Kan. June 23, 2017); *see also Fish v. Kobach*, No. 16-cv-2105-JAR, slip op. at 8 n.27 (D. Kan. July 25, 2017), ECF No. 374 (affirming magistrate judge's grant of sanctions, noting that the representations at issue were not the only "statements made or positions taken by Secretary Kobach that have called his credibility into question," and collecting examples).

58.     When recently asked about his previous statements about Donald Trump winning the popular vote and the absence of evidence to support this claim, Vice Chair Kobach replied, "I guess it all depends on what you define as evidence."  "Voting Commissioner Kris Kobach Defends U.S. Request For Voter Information," *All Things Considered*, Nat'l Pub. Radio (June

30, 2017), http://www.npr.org/2017/06/30/535059231/voting-commissioner-kris-kobach-defends-u-s-request-for-voter-information.

59.     Like Secretary Kobach, Commission member Ken Blackwell has made unfounded assertions about noncitizens voting.  In response to President Trump's claims that he had won the popular vote but for illegal votes, Mr. Blackwell penned a commentary asserting that Secretary Clinton received over 800,000 illegal votes from non-citizens, and based this claim on the work of Old Dominion University professor Jesse Richman.  Ken Blackwell, *Election Integrity Can't Wait*, The Daily Caller (Feb. 7, 2017), http://dailycaller.com/2017/02/07/electoral-integrity-cant-wait/.  Professor Richman, however, disclaimed this use of his research, expressly stating that he has not done a study of the 2016 election.  *See* Jesse Richman, "I Do Not Support the Washington Times Piece" (Jan. 27, 2017), https://fs.wp.odu.edu/jrichman/2017/01/27/i-do-not-support-the-washington-times-piece/.

Professor Richman has also expressly written, "My study DOES NOT support Trump's claim that millions of non-citizens voted in the 2016 election."  Jesse Richman, "Why I Would Sign the 'Open Letter' If It Were True" (March 10, 2017), https://fs.wp.odu.edu/jrichman/2017/03/10/why-i-would-sign-the-open-letter-if-it-were-true/.

60.     Like Secretary Kobach, Mr. Blackwell has unlawfully disenfranchised voters.  As Secretary of State of Ohio, Mr. Blackwell announced on September 7, 2004, less than a month before the voter registration deadline for the 2004 general election, that voter registration forms would be processed only if they were printed on eighty-pound unwaxed white paper stock, specifying that complete voter registration forms from eligible voters that were printed on less heavy-weight paper would not be processed.  *See* Ohio Secretary of State Directive, No. 2004-31, Section II (Sept. 7, 2004).  The directive was later reversed.  Regarding that same election,

the Sixth Circuit Court of Appeals determined that another Directive from Mr. Blackwell violated the Help America Vote Act, denying provisional ballots to individuals clearly entitled to cast them under the law.  *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

61.     Commission member Gardner has a similar record.   Secretary Gardner has recently pushed for tightening access to the polls in New Hampshire, saying that the state has "drive-by voting."      *See* Associated Press, N.H. Pub. Radio (Nov. 26, 2016), http://nhpr.org/post/republicans-looking-tighten-nh-election-laws#stream/0.

62.     Like Secretary Kobach, Secretary Gardner has been found by a court to have unlawfully disenfranchised voters in his State.  The New Hampshire Supreme Court found that Gardner promulgated a voter registration form that was "confusing and inaccurate," and "could cause an otherwise qualified voter not to register to vote in New Hampshire."  *Guare v. New Hampshire*, 167 N.H. 658, 665, 117 A.3d 731, 738 (2015).  The Court concluded that, "as a matter of law, the burden it imposes upon the fundamental right to vote is unreasonable."  *Id.*

63.     Commission member McCormick has a similar record of supporting policies and practices that have disenfranchised voters.  In litigation involving Vice Chair Kobach's efforts to require documentary proof of citizenship from individuals registering to vote with the federal voter registration form, EAC Commissioner McCormick attempted to reject the Department of Justice as counsel for the EAC and retain her own personal counsel, in order to file memoranda and declarations in support of Secretary Kobach's position in the case.  *See* Docket, *League of Women Voters v. Newby*, No. 16-cv-236-RJL (D.D.C.).  The D.C. Circuit later ruled that the documentation requirements favored by Secretary Kobach and Commissioner McCormick created "a substantial risk that citizens will be disenfranchised in the present federal election

cycle[,]" and will "make it substantially more difficult for groups like the League [of Women Voters] to register otherwise qualified voters." *League of Women Voters v. Newby*, 838 F.3d 1, 12-13 (D.C. Cir. 2016).

64.     On June 21, 2017, President Trump named three additional Commission members: Luis Borunda, David K. Dunn, and Mark Rhodes.  Press Release, Office of the Press Secretary, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (June 21, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/21/president-donald-j-trump-announces-intent-nominate-personnel-key.   Two of these appointees have no experience with election administration.

65.     Mark Rhodes is the county clerk of Wood County, West Virginia, a county with 56,105 registered voters.   *See* W.V. Secretary of State, Voter Registration Totals, http://www.sos.wv.gov/elections/VoterRegistration/Pages/Voter_Registration.aspx  (last visited July 6, 2017).  Upon his appointment, Clerk Rhodes stated that he was not sure why he was appointed to the Pence-Kobach Commission, and that he thought that West Virginia's Republican Secretary of State recommended him because Vice President Pence and Vice Chair Kobach were looking for a Democratic county clerk, and "there's not a whole lot of those in West Virginia."  Kira Lerner, *The White House's Voter Fraud Commission Is Starting To Take Shape*, Think Progress (June 22, 2017),  https://thinkprogress.org/fraud-commission-rhodes-bf8cd04daec4.

66.     David K. Dunn  was  previously  a  member  of  the  Arkansas  House  of Representatives.  He did not have any experience in administering elections.  Capitol Partners, http://www.capitolpartners.co/partners/ (last visited July 6, 2017).  Upon his appointment, Mr. Dunn stated, "I don't know why this has fallen on my shoulders . . . I'm just a very small old

country boy from Arkansas in this bigger commission with Vice President Pence, and I'm just going to do the best I can, to be honest." Arkansas's Republican Secretary of State recommended him to the Commission. Sam Levine, *Some of Trump's New Election Investigators Don't Seem To Have Much Election Experience*, Huffington Post (June 22, 2017), *available at* http://www.huffingtonpost.com/entry/trump-voter-fraud-commission_us_594c1068e 4b01cdedf01e75e?3pa. On October 16, 2017, Commissioner Dunn passed away.

67.     Luis Borunda is the Deputy Secretary of State of Maryland, a position that has no elections-related responsibilities. On July 3, 2017, Deputy Secretary Borunda resigned from the Pence-Kobach Commission. *See* Luke Broadwater, *Maryland Official Resigns from Trump Voter Fraud Panel*, Balt. Sun (July 3, 2017), http://www.baltimoresun.com/news/maryland/politics/bs-md-borunda-resigns-trump-20170703-story,amp.html.

68.     On June 29, 2017, President Trump named Hans A. von Spakovsky as a member of the Pence-Kobach Commission. Press Release, Office of the Press Secretary, President Donald J. Trump Announces Key Additions to his Administration (June 29, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/29/president-donald-j-trump-announces-key-additions-his-administration.

69.     Mr. von Spakovsky has a long history of making baseless claims about voter fraud. *See, e.g.*, Jane Mayer, *The Voter-Fraud Myth*, The New Yorker (Oct. 29-Nov. 5, 2012), http://www.newyorker.com/magazine/2012/10/29/the-voter-fraud-myth; Richard L. Hasen, The Voting Wars 62-64, 129 (Yale Univ. Press 2012). In response to President Trump's baseless claims that he had won the popular vote but for illegal votes, Mr. von Spakovsky wrote, "there is a real chance that significant numbers of noncitizens and others are indeed voting illegally."

Hans A. von Spakovsky & John Fund, *Do Illegal Votes Decide Elections?*, Wall St. J. (Nov. 30, 2016), https://www.wsj.com/articles/do-illegal-votes-decide-elections-1480551000.

70.     In the investigation report of the Office of the Inspector General of the EAC regarding reports on voter fraud, former Chair of the EAC Paul DeGregorio stated that "too many of [von Spakovsky's] decisions are clouded by his partisan thinking" and reported that "von Spakovsky thought DeGregorio should use his position (on the EAC commission) to advance the Republican party's agenda."   U.S. Elec. Assistance Comm'n Office of Inspector Gen., Report of Investigation: Preparation of the Voter Fraud and Voter Intimidation Report 17 (March   2008),   https://www.eac.gov/assets/1/1/EAC%20Inspector%20General%20Report %20on%20the%20Preparation%20of%20the%20Voter%20Fraud%20and%20Voter% 20Intimidation.pdf.

71.     On July 10, 2017, President Trump named J. Christian Adams and Judge Alan Lamar King as members of the Pence-Kobach Commission.  Press Release, Office of the Press Secretary, President Donald J. Trump Announces Key Additions to his Administration (July 10, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/07/10/president-donald-j-trump-announces-key-additions-his-administration.

72.     Mr. Adams, President and General Counsel of the Public Interest Legal Foundation ("PILF"), an organization that promotes and defends laws and policies that restricts access to the polls, has a long history of promoting restrictive voting laws and making baseless claims about voter fraud.  *See, e.g.*, Pema Levy, *Lawyer Behind Nationwide Voter Purge Effort Named   to   Trump   Election   Commission*,   Mother   Jones   (July   11,   2017), http://www.motherjones.com/politics/2017/07/lawyer-behind-nationwide-voter-purge-effort-named-to-trump-election-commission/.   Mr. Adams, too, has publicly affirmed President

Trump's claims that he won the popular vote but for illegal votes.  J. Christian Adams, *Trump Destroys Elites' Assumptions: Autopsy of the 2012 'GOP Autopsy'*, PJ Media (Nov. 9, 2016), https://pjmedia.com/jchristianadams/2016/11/09/trump-destroys-elite-assumptions-autopsy-of-the-gop-autopsy/3/.  On December 7, 2017, Mr. Adams stated, "we hear a lot about foreign influence.  Well, I can tell you the greatest foreign influence in our elections are aliens who are getting on the rolls and aliens who are voting," and reportedly urged states to enact citizenship verification requirements when people register to vote, Sam Levine, *3 Members of Trump Panel Warn of Voter Fraud to Influential Conservative Group*, Huffington Post (Dec. 7, 2017), https://www.huffingtonpost.com/entry/trump-voter-fraud-commission-alec_us_5a29bfbde4b069ec48abff48 [hereinafter Levine, *3 Members*], mirroring Vice Chair Kobach's proposed amendment to the NVRA.

73.     Commissioners von Spakovsky, Adams, and Blackwell are all members of the policy board of the American Civil Rights Union ("ACRU"), a group that has advocated for aggressive purges of registered voters from the rolls.  Commissioners von Spakovsky and Adams are both members of the Board of Directors of PILF.  In a recent decision, the United States Court of Appeals for the Third Circuit rejected an attempt by ACRU, represented by PILF, to force the City of Philadelphia to engage in more aggressive purges of its voter rolls, stating that ACRU's arguments were "exactly the kind of statutory contortion that led the District Court to respond to the ACRU's arguments by threatening to impose sanctions for blatant misrepresentation of the [NVRA]," *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 184 (3d Cir. 2017), and that "[i]t is the ACRU's interpretation of the NVRA, not the Commissioners', that most threatens the goals of the statute and the integrity of the vote," *id.* at 187.

74.     Judge King is a Judge of Probate for the probate court of Jefferson County, Alabama, and in that role, chief election official for the county.  Like Commission members Rhodes and Dunn, Judge King was recommended for appointment by his state's Republican Secretary of State.  *See* Leada Gore, *Trump Appoints Alabama Probate Judge, a Democrat, to Controversial Election Commission*, AL.com (July 11, 2017), http://www.al.com/news/index.ssf/2017/07/alabama_probate_judge_named_to.html.

C.     Offices and Logistics of the Pence-Kobach Commission

75.     The office location and address of the Pence-Kobach Commission has not been made public.

76.     The Pence-Kobach Commission's DFO Andrew Kossack is an Associate Counsel in the Office of the Vice President, which is an office within the Executive Office of the President.  The offices of the Office of the Vice President are primarily located within the Eisenhower Executive Office Building ("EEOB").

77.     The EEOB is not generally open to members of the public.  In order to enter the EEOB, a visitor must have a set meeting with a particular person in the building, who must enter the full name, Social Security Number, date of birth, citizenship status, country of birth, gender, and city and state of residence of each visitor into the White House Worker and Visitor Entry System ("WAVES"), maintained by the United States Secret Service, for review and approval prior to entry.

78.     The Pence-Kobach Commission's Committee Management Officer is an employee of the GSA.

79.     The names of the staff of the Pence-Kobach Commission have not been made public.  The Commission was reported to be staffed by employees of the Executive Office of the

President.  *See* Dave Boyer, *Voter Fraud and Suppression Commission to Meet in July*, Wash. Times (June 27, 2017), http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-commission-to-meet-in-/ [hereinafter Boyer, *Voter Fraud and Suppression*].  The Charter of the Pence-Kobach Commission indicates that it is staffed by the GSA.  Charter ¶ 6.

80.     On July 1, 2017, a reporter for ProPublica requested for, the fifth time, a full list of staff working for the Commission.  On information and belief, she has still not received a response.

81.     The Charter of the Pence-Kobach Commission indicated that there would be three full-time equivalent employees working for the Commission throughout its duration.  Charter ¶ 7.  Vice Chair Kobach stated that the Commission's staff would be "substantial," indicating that the Commission had full-time staff and people "detailed to work for the commission from other agencies."  Sam Levine, *Watchdog Groups Sure for Documents on Trump Voter Fraud Probe*, Huffington Post (Aug. 22, 2017), http://www.huffingtonpost.com/entry/trump-voter-fraudprobe_us_599c4ae9e4b04c532f448f59.

82.     On October 13, 2017, a researcher for the Pence-Kobach Commission was arrested on child pornography charges after such materials were found on his cell phone.  John Wagner, *Trump Voter Fraud Commission Researcher Arrested on Child Pornography Charges*, Wash. Post. (Oct. 14, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/10/14/trump-voter-fraud-commission-researcher-arrested-on-child-pornography-charges/?utm_term=.6d88768a8bcb.  Even the existence of this staffer was not known to the public or to certain Commissioners until reports of the arrest became public.  *See* Letter from Matthew Dunlap, Commissioner and Maine Secretary of State, to Andrew Kossack,

Designated Federal Officer, at 2 (Oct. 17, 2017), *available at* https://www.documentcloud.org/ documents/4111815-PACEI-10-17-17.html [hereinafter Dunlap Letter].

83.     Pence-Kobach Commission DFO Kossack has stated under penalty of perjury that the Commission's documents would be made available for public inspection within the GSA. Kossack Decl. ¶ 10, ECF No. 16-1.  The location of the office has not been made public.

84.     One of the Commission documents related to July 19, 2017 meeting, was labeled as "copyrighted material," that would be "available for inspection by contacting gsa.cmo1@gsa.gov."   *See* Presidential Advisory Comm'n on Election Integrity Resources, https://www.whitehouse.gov/presidential-advisory-commission-election-integrity-resources  (last visited Dec. 12, 2017).

85.     The address gsa.cmo1@gsa.gov is the e-mail address for Ms. Wills, an employee of the GSA and the Pence-Kobach Commission's CMO.

## III.     Activities of the Pence-Kobach Commission

86.     On June 28, 2017, Vice President Pence, as Chair of the Pence-Kobach Commission, held a telephonic meeting with the members of the Commission.   *See* Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory   Commission   on   Election   Integrity   (June   28,   2017),   *available   at* https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election [hereinafter Pence Release].

87.     The meeting lasted for ninety minutes.   *See* John DiStaso, *NH Primary Source: Gardner Says Trump Election Integrity Commission Call "Couldn't Have Been Better"*, WMUR 9  ABC  (June  29,  2017),  http://www.wmur.com/article/gardner-says-trump-election-integrity-commission-call-couldnt-have-been-better/10237642.

88.     This meeting of the Pence-Kobach Commission was not noticed in the Federal Register nor was it held open to the public.  Upon information and belief, the agenda for the June 28 meeting was not made available for public inspection and copying, nor were any of the documents provided to the members in relation to the meeting.  The meeting was therefore unlawful.

89.     The June 28 meeting was not merely an administrative or preparatory meeting conducted solely to prepare for a future advisory committee meeting, to draft a position paper, or to discuss merely administrative matters.

90.     During this unlawful telephonic meeting, Vice Chair Kobach told the members of the Commission that he was sending a letter "to the 50 states and District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls and feedback on how to improve election integrity."  Pence Release.

91.     During this unlawful meeting, the members of the Pence-Kobach Commission deliberated substantive matters, including the unprecedented decision to aggregate the personal data of every registered voter in the United States for the purpose of identifying potential double registrants or other ineligible registrants.  *See* Celeste Katz, *Trump Election Integrity Commission Member: 'We Should Have Predicted' the Backlash*, Mic (July 5, 2017), https://mic.com/articles/181510/trump-election-integrity-commission-member-we-should-have-predicted-the-backlash#.FJyGiAIZO.

92.     The minutes and transcript of the June 28 meeting have not been made public.

93.     On June 13, 2017, Vice Chair Kobach, along with DFO Kossack and other members of the Office of the Vice President, communicated with now-Commissioners von Spakovsky and Adams regarding the June 28, 2017 telephonic meeting, weeks before either

now-Commissioners von Spakovsky and Adams were appointed to the Pence-Kobach Commission.  Vaughn Index, Entry 360, at 21, *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1354 (D.D.C. Sept. 29, 2017), ECF No. 33-3.

94.     Subsequent to the unlawful meeting, Commission member Secretary Dunlap reported that during the meeting, in regard to sending such letters to the states, he had advised the Commission, "to be careful how you go at this because election officials are very sensitive guardians of this information, so you want to make sure you're asking for it, not demanding it, and that it really should only cover the information that is publicly available in your state."  Sam Levine, *Trump Voter Fraud Commission Was Cautioned About Seeking Sensitive Voter Information*, Huffington Post (July 5, 2017), http://www.huffingtonpost.com/entry/trump-voter-fraud-commission_us_595d511fe4b02e9bdb0a073d  [hereinafter Levine, *Commission Was Cautioned*].

95.     At the unlawful meeting, the Commission reportedly deliberated and concluded that they did not need to review the language of the letters to the states because only Vice Chair Kobach would sign them.  Levine, *Commission Was Cautioned*; *see also* Tal Kopan, *Pence-Kobach Voting Commission Alarms States with Info Request*, CNN (July 1, 2017), http://www.cnn.com/2017/06/30/politics/kris-kobach-voter-commission-rolls/index.html   (citing statements from Commission member, Secretary Dunlap of Maine, and spokesperson for Vice President Pence, Marc Lotter).

96.     Subsequent to the Commission's determination that the Commissioners did not need to review Vice Chair Kobach's letter, on June 28, 2017, Vice Chair Kobach sent a letter to the Secretary of State of each of the fifty states and to the District of Columbia requesting

submission via e-mail or FTP site by July 14, 2017, of voter roll data, including "the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *See, e.g.*, Letter from Kris Kobach to Elaine Marshall, North Carolina Secretary of State (June 28, 2017), https://assets.documentcloud.org/documents/3881856/Correspondence-PEIC-Letter-to-North-Carolina.pdf; *see also* Pence Release; Brandon Carter, *Trump Election Panel Asks All 50 States for Voter Roll Data*, The Hill (June 29, 2017), http://thehill.com/homenews/administration/340117-trump-election-integrity-commission-requests-years-of-voter-data-from.

97.     Vice Chair Kobach communicated with now-Commissioners von Spakovsky and Adams regarding the letters to the states regarding data collection in multiple e-mails on June 21, 22, 23, 26, and 27, 2017, prior to the appointment of either von Spakovsky or Adams to the Commission and prior to discussing the letter with the actual members of the Commission during the June 28, 2017 telephonic meeting.  Vaughn Index, Entry 367, at 21; *id.* Entry 373, at 22. Some of these communications occurred before the Pence-Kobach Commission charter was filed.

98.     Commissioner Dunlap further stated that during the unlawful meeting, Vice Chair Kobach did not indicate that the letter to the states had already been drafted nor did Vice Chair Kobach indicate that now-Commissioners von Spakovsky and Adams had been involved in the plan to request data.  Jessica Huseman, *Who's Really in Charge of the Voting Fraud*

*Commission?*, ProPublica (Oct. 5, 2017), https://www.propublica.org/article/whos-really-in-charge-of-the-voting-fraud-commission.

99.    Vice Chair Kobach has further represented that he expects that "every investigation" the Commission conducts will require voter roll data.  He also contemplated witnesses testifying about particular individuals' voting history and the need "to confirm" such voter history through the voter roll data.  Kris W. Kobach, *Why States Need to Assist the Presidential Commission on Election Integrity*, *Breitbart* (July 3, 2017), http://www.breitbart.com/biggovernment/2017/07/03/kobach-why-states-need-to-assist-the-presidential-commissionon-election-integrity/.  On information and belief, Vice Chair Kobach did not discuss such potential activities of the Pence-Kobach Commission with all of the other Commissioners, nor suggest to them that the Commission would undertake investigations of particular individuals when describing the request for voter roll data.

100.    Such investigations of particular individuals are not "solely advisory," as permitted under FACA and provided for in the Executive Order permitting the establishment of the Pence-Kobach Commission.  Exec. Order 13,799, § 3; 5 U.S.C. app. 2 § 9(b).

101.    Underscoring the need for public oversight, Vice Chair Kobach's request was of such public concern that officials in 48 states had partially or fully refused to comply with the request, *see* Ari Berman, *Suppression Plans are Backfiring Badly*, The Nation (July 5, 2017), https://www.thenation.com/article/the-trump-administrations-voter-suppression-plans-are-backfiring-badly/, and individuals have sought to cancel their registration for fear of how the Commission will handle personal data, *see* Corey Hutchins, *In Colorado, 'Confusion,' 'Hysteria,' and Voters Unregistering at Some Local Election Offices*, Colo. Indep. (July 7, 2017),        http://www.coloradoindependent.com/166227/colorado-voting-trump-unregister-

confidential; Jesse Paul, *No Evidence 5,000 Colorado Voters Who Unregistered Were Ineligible to Vote, Secretary of State Says*, Denver Post (July 27, 2017), http://www.denverpost.com/2017/07/27/colorado-voters-deregistration-trump-administration/.

102.    Cybersecurity experts have described the Commission's plans to aggregate this data as a "gold mine" for hackers.  Eric Geller & Corey Bennett, *Trump Voter-Fraud Panel's Data Request a Gold Mine for Hackers, Experts Warn*, Politico (July 1, 2017), http://www.politico.com/story/2017/07/01/trump-voter-fraud-panel-hackers-240168.     Michael Chertoff, the former Secretary of Homeland Security under President George W. Bush, has written an op-ed titled "Trump's Voter Data Request Poses an Unnoticed Danger," noting that "whatever the political, legal and constitutional issues raised by this data request, one issue has barely been part of the public discussion: national security."  Michael Chertoff, *Trump's Voter Data Request Poses an Unnoticed Danger*, Wash. Post (July 5, 2017), https://www.washingtonpost.com/opinions/trumps-voter-data-request-poses-an-unnoticed-danger--to-national-security/2017/07/05/470efce0-60c9-11e7-8adc-fea80e32bf47_story.html?utm_term=.47ed19183852.  In an amicus brief filed on behalf of the plaintiffs in *Common Cause v. Presidential Advisory Commission on Election Integrity*, former national security and technology officials, including James R Clapper, Jr., the former Director of National Intelligence, warned that "[a] large database aggregating [personal identifying information] of millions of American voters in one place, as the Commission has compiled and continues to compile, would constitute a treasure trove for malicious actors," and that "the Commission's maintenance of this database  could enable malicious actors to inflict significant harms on the nation's electoral process as well as on individual voters."  Br. of Former Nat'l Security & Technology Officials as Amici Curiae Supporting Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss

at 3-4, *Common Cause v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1398 (RCL) (D.D.C. Dec. 5, 2017), ECF No. 38-1.   Upon information and belief, security, privacy, and data protection issues were not meaningfully considered by the Commission in making the unprecedented decision to request personal voter data from the states.

103.    Upon information and belief, none of the members of the Pence-Kobach Commission have expertise in cybersecurity, privacy, and/or data protection.

104.    The Pence-Kobach Commission initially intended to use the Department of Defense's Safe Access File Exchange ("SAFE") system to collect and store voter data from the states.   Kobach Decl. ¶ 5, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1320 (CKK) (D.D.C. July 5, 2017), ECF No. 8-1 ("First Kobach Decl."). Just five days later, seemingly in response to the Department of Defense being added as a defendant in that matter, Vice Chair Kobach submitted a new declaration stating that the Pence-Kobach Commission no longer intended to use the SAFE system and instead would "repurpos[e]" an existing system within the White House to collect and store the voter data. Third Kobach Decl. ¶ 1, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1320 (CKK) (D.D.C. July 10, 2017), ECF No. 24-1.   The only explanation provided to the court was that the change was made "[i]n order not to impact the ability of other customers to use the [SAFE] site."

105.    On July 5, 2017, the July 19, 2017 in-person meeting of the Pence-Kobach Commission was noticed in the Federal Register, 14 days prior to the scheduled meeting.   The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting, 82 Fed. Reg. 31063 (July 5, 2017) [hereinafter Meeting Notice].

106.    The notice stated that the meeting would be held in the EEOB and would be available to the public only through an internet livestream.  Meeting Notice, 82 Fed. Reg. 31063.

107.    Notwithstanding the fact that the Commission had not yet had a lawful public meeting, its work had already begun.  On July 5, 2017, Vice Chair Kobach publicly declared under penalty of perjury that "information [had been] provided to [him] in [his] official capacity as Vice Chair of the Commission."  First Kobach Decl. ¶ 2.  Vice Chair Kobach did not identify what information contained in his declaration was provided to him in his capacity as Vice Chair, nor did he identify who provided the information, or in what form.

108.    On July 6, 2017, Vice Chair Kobach communicated with Commissioner von Spakovsky and now-Commissioner Adams regarding the availability of data from the various states prior to now-Commissioner Adams' appointment to the Commission and without including any other Commissioners, or on information and belief, without advising the other Commissioners regarding this communication or sharing its substance.   Vaughn Index, Entry 418, at 24.

109.    A spokesperson for Vice President Pence, Marc Lotter, stated, on July 5, 2017, that the Pence-Kobach Commission had already formulated plans for the voter data that it is collecting, explaining that the Commission intended to check the information contained in state voter rolls against data housed in various federal databases to identify supposedly ineligible registrants.   That determination was made before any lawful meetings of the Pence-Kobach Commission had been held.  Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, ProPublica (July 6, 2017), https://www.propublica.org/ article/election-experts-see-flaws-trump-voter-commissions-plan-to-smoke-out-fraud [hereinafter Huseman, *Election Experts*].  Mr. Lotter would not specify which federal databases

the Commission intended to use, but public reports from June 27, 2017 indicated that the Commission intended to compare state voter roll data against the federal database of non-citizens, which would lead to numerous false positive matches.  *Id.* (citing Boyer, *Voter Fraud and Suppression*).

110.    Commission DFO Kossack has communicated with the Department of Justice and the Social Security Administration regarding data collection.  *See, e.g.*, Vaughn Index, Entries 747, 748, at 39.

111.    Election administration experts have stated that running such a comparison is certain to lead to numerous false positives due to minor inaccuracies on the voter rolls, inconsistencies in data collection and formatting, and the reality of common names and birthdays.  *See* Huseman, *Election Experts*; Maggie Koerth-Baker, *Trump's Voter Fraud Commission is Facing a Tough Data Challenge*, FiveThirtyEight, July 7, 2017, https://fivethirtyeight.com/features/trumps-voter-fraud-commission-is-facing-a-tough-data-challenge/.

112.    Indeed, Secretary Kobach currently operates an "Interstate Crosscheck" system, which he touted at the July 19 meeting of the Pence-Kobach Commission, which purports to compare voter registration files in multiple states to search for double voters.  But a team of researchers from Stanford, Harvard, the University of Pennsylvania, and Microsoft concluded that, if Secretary Kobach's Crosscheck system were used for voter list maintenance in one state (Iowa), 99.5% of the purported matches would be false positives, such that "200 legitimate voters may be impeded from voting for every double vote stopped."  *See* Sharad Goel et al., One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections, (Oct. 24, 2017), https://5harad.com/papers/1p1v.pdf.  Upon information and belief, these issues

were not considered by the Commission.   Without the requisite transparency about the Commission's activities in this area, among others, there is no way for the public have meaningful oversight and assess the Commission's recommendations.

113.   On December 7, 2017, Commissioner von Spakovsky also touted the Kobach Crosscheck system, and urged states to compare their voter rolls against federal databases to identify non-citizens.  Levine, *3 Members*.

114.   Underscoring the information security concerns that accompany aggregating voter information at the national level, documents released through state freedom of information law requests revealed multiple security weaknesses in Vice Chair Kobach's Crosscheck system. Crosscheck's files are hosted on an insecure server, "usernames and passwords were regularly shared by email, making them vulnerable to snooping," and the passwords were too simplistic and not changed regularly.  *See* Jessica Huseman & Derek Willis, *The Voter Fraud Commission Wants Your—but Experts Say They Can't Keep It Safe*," ProPublica (Oct. 23, 2017), https://www.propublica.org/article/crosscheck-the-voter-fraud-commission-wants-your-data-keep-it-safe; *see also* Interstate Crosscheck FOIA Documents, Indivisible Chicago, https://www.indivisiblechicago.com/crosscheck-documents (last visited Dec. 11, 2017) (housing underlying documents obtained via state freedom of information law).

115.   On July 5, 2017, Plaintiffs requested that the Pence-Kobach Commission produce or make available for public inspection and copying all materials "which were made available to or prepared for or by" the Commission.  Plaintiffs requested a reply to their letter by July 14, 2017.  As of the date of this Amended Complaint, Plaintiffs still have not received a response to their letter.

116.     On July 13, 2017, the Pence-Kobach Commission hastily posted a Commission webpage on the White House "Blog."  The White House, Presidential Advisory Commission on Election Integrity, The White House Blog (July 13, 2017 10:15 AM) https://www.whitehouse.gov/blog/2017/07/13/presidential-advisory-commission-election-integrity.

117.     On July 19, 2017, the Pence-Kobach Commission held an in-person meeting.  The public was barred from attending this meeting in-person and was only allowed to view the meeting via livestream, which was subject to technical difficulties throughout, thus effectively closing portions of the meeting.  Vice Chair Kobach posted a message on his Facebook page acknowledging the disruption of the livestream.  *See* Mem. in Supp. of Pl.'s Mot. for a Status Conf. et al. at 9-10, *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1354-CKK (D.D.C. July 21, 2017), ECF No. 21-1.

118.     During the July 19, 2017 meeting, the Commission adopted Bylaws that, among other things, provided "The Designated Federal Officer ("DFO") will be a full-time officer or employee of the Federal Government appointed by the GSA Administrator, pursuant to 41 CFR § 102-3.105 and in consultation with the Chair of the Commission."  Bylaws § III(D), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-bylaws_final.PDF.

119.     On July 26, 2017, Vice Chair Kobach again sent letters to each of the states and the District of Columbia, this time seeking "publicly available voter registration records."  *See, e.g.*, Letter from Kris Kobach to Hon. John Merrill, Ala. Sec'y of State (July 26, 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf.  In this letter, Vice Chair Kobach stated that "[t]he only information that will be

made public are statistical conclusions drawn from the data, other general observations that may be drawn from the data, and any correspondence that you may send to the Commission." *Id.*

120.    This second request for voter data was not discussed at the July 19, 2017 meeting of the Pence-Kobach Commission nor in discussions among the Commissioners thereafter. Regarding this request, Commissioner Dunlap stated, "If we're going to act as a commission, we should really be considering the entire request for data as a body, and determining what it is we're researching and how to look for it."  Press Release, Me. Sec'y of State, Secretary Dunlap Reviewing Elections Commission's Second Request for Voter Data (July 27, 2017), http://www.maine.gov/sos/news/2017/electioncommission2.html.

121.    Commissioner Lawson also acknowledged that she does not know how the Commission plans to use the data requested from the states.  Tony Cook & Kaitlin L. Lange, *Indiana's Secretary of State Could be Check on Trump Voter Fraud Commission*, IndyStar (July 9, 2017), http://www.indystar.com/story/news/politics/2017/07/09/indianas-connie-lawson-could-check-trump-voterfraudcommission/442250001/.

122.    The full scope of the Pence-Kobach Commission's documents "made available to" or "provided for or by" the Commission were not publicly posted prior to the July 19 meeting.  And many other documents "made available to" or "provided for or by" the Commission have still not been made available for public inspection.

123.    Following the July 19, 2017 meeting, Commissioners Rhodes, Dunn, and Dunlap reported that they had not been receiving any information from the Commission other than the date of the September 12, 2017 meeting.  Kira Lerner, *Democrats on Trump's Voting Commission Iced Out Since First Meeting*, Think Progress (Aug. 22, 2017), https://thinkprogress.org/democrats-voting-commission-ceec3ea98a33/.

124.   On August 25, 2017, the GSA published the notice announcing a September 12, 2017 meeting of the Pence-Kobach Commission.  82 Fed. Reg. 40,581, 40,582 (Aug. 25, 2017). The meeting notice stated that written comments "pertaining to a particular meeting should be submitted at least five (5) days prior to a specific meeting."  *Id.*

125.   The Commission did not ensure that all documents "made available to" or "provided for or by" the Commission would be posted sufficiently in advance of this deadline for comments.  Oral comments from the public were not permitted at the September 12, 2017 meeting.

126.   Defendants continue to disclaim that the Pence-Kobach Commission is subject to FACA.  Mem. in Opp. to Pl.'s Emergency Mot. for a TRO at 12, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-1320 (CKK) (D.D.C. July 5, 2017), ECF No. 8; *see also* Kossack Decl. ¶ 2, ECF No. 16-1 ("The Commission is *voluntarily* complying with the provisions of [FACA].") (emphasis added).

127.   On September 7, 2017, Vice Chair Kobach published a column on the alt-right "news" site, Breitbart, claiming that "facts" demonstrated that illegal votes determined the 2016 New Hampshire Senate election and "perhaps" the state's four electoral votes.  Kris W. Kobach, *Exclusive – Kobach: It Appears That Out-of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race*, Breitbart (Sept. 7, 2017), http://www.breitbart.com/big-government/2017/09/07/exclusive-kobach-out-of-state-voters-changed-outcome-new-hampshire-senate-race/.  The article misstated the law of New Hampshire to conclude that the votes were cast illegally.  The article appears on the Pence-Kobach Commission's website.  Presidential Advisory Comm'n on Election Integrity Resources, https://www.whitehouse.gov/sites/

whitehouse.gov/files/docs/Kobach-It-Appears-Out-of-State-Voters-Changed-Outcome.pdf (last visited Dec. 11, 2017).

128.    On September 12, 2017, during the meeting of the Pence-Kobach Commission, Commissioner Gardner, the Secretary of State of New Hampshire, confirmed that the votes referenced by Vice Chair Kobach were valid.  During this meeting, Vice Chair Kobach still touted this information as proof of illegal votes, though later admitted that his claims in the Breitbart article "may have been imprecise." Ben Kamisar, *Kobach Defends Controversial Breitbart Column on NH Voter Fraud*, The Hill (Sept. 12, 2017), http://thehill.com/homenews/administration/350270-kobach-defends-controversial-breitbart-column-on-nh-voter-fraud.

129.    On September 14, 2017, a member of the public e-mailed Vice Chair Kobach, and the ACRU Policy Board Commissioners, von Spakovsky, Blackwell, and Adams, regarding Vice Chair Kobach's unfounded claim of illegal votes in New Hampshire.  On information and belief, this information was not shared with the other Commissioners.  Vaughn Index, Entry 496, at 28.

130.    At the September 12, 2017 meeting of the Pence-Kobach Commission, Commissioner von Spakovsky served as both a member of the Commission and a panelist presenting to the Commission.  Agenda, Second [sic] Meeting of the Presidential Advisory Commission on Election Integrity, Sept. 12, 2017, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/pacei-updated-meeting-agenda-09122017.pdf.

131.    At the same time, other Commissioners had no input regarding the topics the meeting would address or who would be invited to present.  *See* Complaint ¶ 51, *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 17-cv-2361 (D.D.C. Nov. 9, 2017), ECF No. 1.

132.    Commissioner King was not present at the September 12, 2017 meeting because of a scheduling conflict.  He had told the Commission that the date did not work for his schedule prior to the date of the meeting being set.  Deborah Barfield Berry, *Trump's Voter Fraud Commission Appears to Have Gone Dark*, USA Today (Nov. 3, 2017), https://www.usatoday.com/story/news/politics/2017/11/03/trump-voter-fraud-election-commission-appears-have-gone-dark/827628001/.

133.    The minutes and transcript of the September 12, 2017 meeting have not been made public.

134.    Also on September 12, 2017, documents released by the Department of Justice in response to a FOIA request showed that on February 22, 2017, someone from the Institute for Constitutional Government at The Heritage Foundation, where Commissioner von Spakovsky is a senior fellow, wrote to the DOJ regarding the yet unestablished Commission, saying that an individual whose name was redacted

> got a very disturbing phone call about the voter fraud commission that Vice President Pence is heading. We are told that the members of this commission are to be named on Tuesday. We're also hearing that they are going to make this bipartisan and include Democrats. There isn't a single Democratic official that will do anything other than obstruct any investigation of voter fraud and issue constant public announcements criticizing the commission and what it is doing, making claims that it is engaged in voter suppression. That decision alone shows how little the WHouse understands about this issue.
>
> There are only a handful of real experts on the conservative side on this issue and not a single one of them . . . have been called other than Kris Kobach, Secretary of State of Kansas. And we are told that some consider him too "controversial" to be on the commission If they are picking mainstream Republican officials and/or academics to man this commission it will be an abject failure because there aren't any that know anything about this or who have paid any attention to this issue over the years.
>
> [Redacted] are concerned that this commission is being organized in a way that will guarantee failure. We are astonished that no one in the WH has even bothered to consult with [redacted] despite the fact that the three of us have written more

on the voter fraud issue than anyone in the country on our side of the political aisle. I think you know from the white paper we sent you that based on our experience we have thought long and hard about what needs to be done.

Letter: Response to FOIA Request on Voter Fraud, Campaign Legal Center (Sept. 12, 2017), http://www.campaignlegalcenter.org/document/letter-response-foia-request-voter-fraud.

135.    Commissioner von Spakovsky denied sending this e-mail.  ProPublica, *Von Spakovsky*, https://soundcloud.com/propublica/von-spakovsky (last visited Dec. 11, 2017).

136.    Shortly thereafter, a spokesperson for the Heritage Foundation confirmed that Commissioner von Spakovsky had indeed sent the e-mail.  Dell Cameron, *Jeff Sessions Was Lobbied to Exclude Democrats from Trump's Election Fraud Panel [Updated]*, Gizmodo (Sept. 12, 2017), https://gizmodo.com/jeff-sessions-was-lobbied-to-exclude-democrats-from-tru-1804006784.

137.    On information and belief, the "white paper" referenced in the e-mail and the related communications have not been made available to the public as part of the Pence-Kobach Commission's documents.

138.    Following the September 12, 2017 meeting, multiple Commissioners have indicated that they have been kept in the dark about the activities of the Pence-Kobach Commission.

139.    Commissioner King has reportedly stated that the Commission should disclose its activities and future plans or else disband.  Based on his experience with the Commission thus far, he said, "It wouldn't surprise me if this whole commission was set up and they had an end result in mind when this commission was first originated."  Sam Levine, *Trump Voter Fraud Commissioner Says Panel Should be More Transparent or Disband*, Huffington Post (Oct. 24,

2017),                https://www.huffingtonpost.com/entry/trump-voter-fraud-probe-alan-king_us_
59ef8424e4b0b7e632655fb5.

140.    Commissioner Dunlap also affirmed that he had no communication with the
Commission since the September 12, 2017 meeting.  *Id.*

141.    Commissioner Dunlap described the Pence-Kobach Commission as having a
"clear" imbalance of power, saying, "Von Spakovsky has a profound influence on this
commission. . . . I never expected to be at the head of the table, but I'm not even sure I'm sitting
at the table[,]" and questioned whether the work of the Commission was being led by Vice
President Pence or by Commissioner von Spakovsky "working in the shadows."  Jessica
Huseman, *Who's Really in Charge of the Voting Fraud Commission*, Pro Publica (Oct. 5, 2017),
https://www.propublica.org/article/whos-really-in-charge-of-the-voting-fraud-commission.

142.    On October 17, 2017, Commissioner Dunlap wrote a letter to DFO Kossack
stating that it was "clear that there is information about this commission being created and shared
among a number of parties, though apparently not universally," and requesting that all of the
Commission's materials be shared with him in his role as a Commissioner.  Dunlap Letter at 1.
He wrote that he had "received utterly no information or updates from Commission staff or
leadership about ongoing active research, inquiries for research requests, documents for
consideration during future meetings, or indeed any information about whether or not the Chair
has plans for convening another meeting.  *Id.*

143.    In response, DFO Kossack stated that he was "consulting with counsel regarding
a response to [Dunlap's] request to ensure any response accords with all applicable law."
Dunlap Decl. ¶ 13; Ex. 4, *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 17-cv-
2361 (D.D.C. Nov. 16, 2017), ECF Nos. 7-1; 7-5.

144.    Vice Chair Kobach responded to Commissioner Dunlap's letter in the press saying, "I'm not aware of any information or discussions or exchange of materials from commission members that would exclude" Commissioner Dunlap.  Ellis Kim, *What's Become of Trump's Voter Fraud Commission? Even Some of Its Members Aren't Sure*, PBS News Hour (Oct. 24, 2017), https://www.pbs.org/newshour/politics/whats-become-of-trumps-voter-fraud-commission-even-some-of-its-members-arent-sure.

145.    However, the index of documents filed in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity* shows multiple e-mails between Vice Chair Kobach and Commissioners von Spakovsky and Adams, even before either man had been appointed to the Commission, that were never shared with Commissioner Dunlap or others.  *See, e.g.*, Vaughn Index, Entries 357, 360, 361, 363, 367, 373, 379, 418, 496, at 21-28.

146.    On October 19, 2017, the Minnesota Voters Alliance announced that it was invited to speak at a December 2017 meeting of the Pence-Kobach Commission.  E-mail from Secretary and Commissioner Dunlap, to DFO Andrew Kossack, at 2 (Oct. 25, 2017), *available at* https://www.documentcloud.org/documents/4177963-Dunlap-Email-2.html   (attaching   e-mail from Minnesota Voters Alliance) [hereinafter Dunlap E-mail].

147.    At least some Commissioners were unaware that there was a meeting planned for December and did not know who invited the Minnesota Voters Alliance or what the organization was expected to testify regarding.  Dunlap E-mail at 1.

148.    Only after several weeks and a desire to extend a court briefing deadline, did lawyers for the Pence-Kobach Commission assert that it was "unlikely" that there would be a meeting in December.  Josh Gerstein, *Judge: Trump Voter Fraud Commission on Ice Till Next Year*, Politico (Nov. 20, 2017), https://www.politico.com/story/2017/11/20/trump-voter-fraud-

commission-judge-252132.  On December 1, 2017, DFO Kossack affirmed that "there will be no meeting in December 2017."  Kossack Decl. ¶ 14, *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 17-cv-2361 (D.D.C. Nov. 9, 2017), ECF No. 30-3.

149.    On November 9, 2017, after being blocked from the Pence-Kobach Commission's internal communications and materials, Commissioner Dunlap sued the Pence-Kobach Commission and others in order to access the Commission's information and in order to validate his rights of participation on the Commission.  Compl., *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 17-cv-2361 (D.D.C. Nov. 9, 2017), ECF No. 1.

150.    Following the filing of Commissioner Dunlap's Complaint, Commissioner Adams tweeted, "Seems like @HvonSpakovsky was onto something:" and attaching a link to a news article regarding Commissioner Dunlap's Complaint, J. Christian Adams (@ElectionLawCtr), Twitter     (Nov.     9,     2017     10:58     AM),     https://twitter.com/ElectionLawCtr/status/ 928652951614382080, an apparent reference to Commissioner von Spakovsky's February 22, 2017 e-mail insisting that no Democrats or mainstream Republicans should be included on the Commission.

151.    On November 20, 2017, Commissioners von Spakovsky and Adams doubled down on their attacks of Commissioner Dunlap and his request for information regarding the Pence-Kobach Commission's activities, penning an op-ed accusing Commissioner Dunlap of "lying" in court filings.  Hans von Spakovsky & J. Christian Adams, *One Democrat on Trump's Electoral Integrity Commission Is Misleading the Public with Complaints About Its Work*, Wash. Examiner    (Nov.    20,    2017),    http://www.washingtonexaminer.com/one-democrat-on-trumps-electoral-integrity-commission-is-misleading-the-public-with-complaints-about-its-work/article/2641268.

**CLAIMS FOR RELIEF**

152.    District courts have "jurisdiction under the APA to review final agency actions for which there is no other adequate remedy," including failure to comply with FACA.  *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 213, 221 (D.D.C. 2017).

153.    District courts have the authority to review agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations."   5 U.S.C. § 706(2).   Federal courts also have non-statutory jurisdiction to review ultra vires actions, as an inherent power of the courts "'to reestablish the limits on [executive] authority.'"  *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

154.    Where statutory duties are violated, courts may also act pursuant to the Declaratory Judgment Act, including as an alternative or in addition to granting mandamus relief, *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 222 (D.D.C. 2009).

155.    District courts are authorized to issue relief in the nature of mandamus compelling federal officials to perform ministerial or nondiscretionary duties.  28 U.S.C. § 1361.  Ministerial or nondiscretionary duties are those "so plainly prescribed as to be free from doubt and equivalent to a positive command."  *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218 (1930).

156.    All of the duties mandated by FACA are "equivalent to a positive command," each using the word "shall" to lay out a mandatory duty.  *Judicial Watch, Inc. v. Nat'l Energy*

*Policy Dev. Grp.*, 219 F. Supp. 2d 20, 43 (D.D.C. 2002) ("by virtue of the use of the word shall,

Congress has made [the duty] nondiscretionary").

## First Claim for Relief
### (Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as to Defendants Pence-Kobach Commission, Administrator Horne, CMO Wills, and GSA)

157.    Defendants have violated the APA by failing to comply with the open meeting

provision of § 10(a) of FACA with respect to both the June 28 telephonic meeting and the July

19 in-person meeting.

158.    Defendants have violated the APA by failing to make *all* documents "made

available to" or "provided for or by" the Commission available for public inspection in violation

of § 10(b) of FACA.

159.    Defendants have violated the APA by failing to keep minutes of the June 28 and

September 12 meetings of the Pence-Kobach Commission, in violation of § 10(c) of FACA , and

by failing to make the minutes available for public inspection in violation of § 10(b) of FACA.

160.    Defendants have violated the APA by failing to make transcripts of each of the

meetings of the Pence-Kobach Commission, in violation of § 11 of FACA.

161.    Defendants have violated the APA by taking action prior to the filing of the

Pence-Kobach Commission Charter, in violation of § 9(c) of FACA.

162.    Despite benefiting from the "political legitimacy" that comes with invoking an

official advisory committee, *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999), Defendants

have violated the APA by failing to make provisions to "require the membership of the advisory

committee to be fairly balanced in terms of the points of view represented and the functions to be

performed by the advisory committee" and to "assure that the advice and recommendations of

the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest," in violation of § 5(b)(2)-(3) of FACA.

163.    Each of these failures to comply with FACA's requirements constitutes final agency action under the APA. 5 U.S.C. § 706.

## Second Claim for Relief
### (Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as to Defendants Pence-Kobach Commission, Administrator Horne, CMO Wills, and GSA)

164.    The Pence-Kobach Commission and those who carry out the activities of the Commission cannot act arbitrarily and capriciously and "are required to engage in reasoned decision making." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) (internal quotation marks omitted).

165.    In making its unprecedented decision to aggregate the personal data of every registered voter in the United States for the purpose of identifying potential double registration and other ineligible registrants, Defendants failed to engage in reasoned decision making by failing to consider all the relevant factors and relying on improper considerations.

166.    In addition, the Pence-Kobach Commission and those who carry out the activities of the Commission can only take action which is authorized under the Executive Order establishing the Commission and defined in the Commission's Charter.

167.    Defendants' actions in undertaking an investigation of particular voters are in excess of the Pence-Kobach Commission's legal authority.

168.    Defendants' operation of the Pence-Kobach Commission in a way that does not comply with each of the mandates of FACA is action in excess of legal authority.

169.    In gathering information, including information regarding activity that is protected by the First Amendment, in order to investigate particular voters, and in failing to

comply with FACA, Defendants have acted in excess of statutory jurisdiction and authority and not in accordance with law, in violation of 5 U.S.C. § 706(2).

### Third Claim for Relief
### (Non-Statutory *Ultra Vires* Claim)

170.    The Pence-Kobach Commission was established as a "solely advisory" entity to "study the registration and voting processes used in Federal elections" and "submit a report to the President" on related "laws, rules, policies, activities, strategies, and practices."  Exec. Order No. 13,799, § 3.

171.    Defendants' actions in undertaking an investigation of particular voters are in excess of the Pence-Kobach Commission's legal authority.

172.    Defendants' actions in collecting individual data about American voters without taking sufficient action to guard against privacy and security risks is in excess of the Pence-Kobach Commission's legal authority.

173.    As Defendants are acting without legal authorization, their actions are ultra vires.

### Fourth Claim for Relief
### (For Declaratory Judgment, as provided for by 28 U.S.C. § 2201-02,
### that Defendants Are in Violation of FACA, 5 U.S.C. §§ 5, 9, 10, and 11)

174.    All meetings of the Pence-Kobach Commission, including those conducted through an electronic medium, must be open to the public; by conducting a telephonic meeting on June 28, 2017, without public access, Defendants have violated § 10(a)(1), (3) of FACA.

175.    All meetings of the Pence-Kobach Commission must be noticed in advance in the Federal Register; by conducting a telephonic meeting on June 28, 2017, without public access, Defendants have violated § 10(a)(2) of FACA.

176.    By failing to create "[d]etailed minutes" of the June 28, 2017 and September 12, 2017 meetings of the Pence-Kobach Commission, Defendants have violated § 10(c) of FACA.

177.    By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission—including those documents related to the June 28, 2017 telephonic meeting, related to the July 19, 2017 and September 12, 2017 meetings, made available to Vice Chair Kobach in his "official capacity as Vice-Chair of the Commission," and all other Commission documents—to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission and the methods by which the public can access the Commission's documents, Defendants violate § 10(b) of FACA.  To the extent the Commission office is contained within the Office of the Vice President, Defendants further violate § 10(b) of FACA by keeping the documents in an office largely closed to public access.  To the extent the Commission office is contained in the GSA, as represented by the Designated Federal Officer, Defendants have still failed to make public the particular location of the office and methods by which the public can access the Commission's documents.

178.    By not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission, ensuring this is the case by holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening and notice of individual attendance, and by providing interrupted livestream access to the July 19 meeting, Defendants have violated § 10(a)(1) of FACA.

179.    By appointing commissioners who have already publicly supported President Trump's conclusion regarding purported illegal voting, demonstrating the Pence-Kobach Commission membership is predisposed to a particular conclusion without yet having done the work to study the issues as contemplated in the Executive Order, and purportedly balancing them

50

with members having little or no experience or knowledge about the subject matter, and who have never held similarly high political offices, President Trump has not "require[d] the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," in violation of § 5(b)(2).

180.   By failing to make any "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," President Trump and the Pence Kobach Commission have violated § 5(b)(3) of FACA.

181.   By undertaking substantive action, including devising the collection of voter data prior to the filing of the Pence-Kobach Commission charter, Defendants have violated § 9(c) of FACA.

182.   By failing to make transcripts of each meeting of the Pence-Kobach Commission, including the June 28, July 19, and September 12 meetings, Defendants have violated § 11 of FACA.

183.   Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the foregoing conduct violates FACA.

**Fifth Claim for Relief**
**(For Relief in the Nature of Mandamus, as provided for by 28 U.S.C. § 1361,**
**Compelling Defendants Vice President Pence, the Pence-Kobach Commission,**
**Administrator Horne, CMO Wills, and the GSA to**
**Comply with their Non-Discretionary Duties of Section 10 of FACA, 5 U.S.C. app. 2 § 10)**

184.   By holding a telephonic meeting of the Pence-Kobach Commission, without providing advance notice in the Federal Register, and by not holding the meeting open to the

public or providing an option for public comment, Defendants have failed to carry out the non-discretionary openness requirements of § 10(a)(1)-(3) of FACA.

185.    By failing to create "[d]etailed minutes" of the June 28, 2017 and September 12, 2017 meetings of the Pence-Kobach Commission, Defendants have failed to carry out the non-discretionary openness requirements of § 10(c) of FACA.

186.    By failing to make available *all* "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission for the June 28, 2017, July 19, 2017, and September 12, 2017 meetings to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission and the methods by which the public can access the Commission's documents, Defendants have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.  To the extent the Commission office is contained within the Office of the Vice President, Defendants further violate § 10(b) of FACA by keeping the documents in an office largely closed to public access.  To the extent the Commission office is contained in the GSA, as represented by the Designated Federal Officer, Defendants have still failed to make public the particular location of the office and methods by which the public can access the Commission's documents.

187.    By failing to provide a transcript of the June 28, 2017 telephonic meeting, and the July 19, 2017 and September 12, 2017 meetings of the Pence-Kobach Commission at the cost of duplication, Defendants have failed to carry out the non-discretionary requirements of § 11(a) of FACA.

188.    By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Pence-Kobach Commission since its inception, to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission, and to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, Defendants have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

189.    By failing to make available the agenda and all documents made available to and/or prepared for or by the Pence-Kobach Commission members in advance of the July 19, 2017 and September 12, 2017 meetings to the public for inspection and copying, including by failing to make public the location of the office of the Pence-Kobach Commission and the methods by which the public can access the Commission's documents, Defendants have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.  To the extent the Commission office is contained within the Office of the Vice President, Defendants further violate § 10(b) of FACA by keeping the documents in an office largely closed to public access. To the extent the Commission office is contained in the GSA, as represented by the Designated Federal Officer, Defendants have still failed to make public the particular location of the office and methods by which the public can access the Commission's documents.

190.    By failing to make available all documents provided to Secretary Kobach in his "official capacity as Vice-Chair of the Commission," *see* Kobach Declaration ¶ 2, to the public for "inspection and copying at a single location" within the office of the Commission,

Defendants have failed to carry out the non-discretionary openness requirements of § 10(b) of FACA.

191.     By holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening, by not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission and by providing remote access that was inaccessible due to technical difficulties, Defendants have failed to carry out the non-discretionary open meeting requirement of § 10(a)(1) of FACA.

**Sixth Claim for Relief**
**(For Relief in the Nature of Mandamus, as provided for by 28 U.S.C. § 1361,**
**Compelling Defendants to Comply with their Non-Discretionary Duties**
**of Section 5 of FACA, 5 U.S.C. app. 2 § 5)**

192.     In stacking the Commission with individuals who have already publicly supported President Trump's false statements regarding purported illegal voting, demonstrating the Pence-Kobach Commission membership is predisposed to a particular conclusion without yet having done the work to study the issues as contemplated in the Executive Order, and purportedly balancing them with members with little or no experience, President Trump has not "require[d] the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," which is a non-discretionary duty under FACA.  5 U.S.C. app. 2 § 5(b)(2).

193.     In appointing Secretary of State Kobach, who publicly affirmed President Trump's claims of voter fraud without evidence, as co-chair of the Commission, President Trump has not made "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest" which is a non-discretionary duty under FACA.  5 U.S.C. app. 2 § 5(b)(3).

194.   In appointing members von Spakovsky, Adams, Blackwell, Gardner, and McCormick, President Trump has not made "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest," which is a non-discretionary duty under FACA. 5 U.S.C. app. 2 § 5(b)(3). Commissioners von Spakovsky, Adams, and Blackwell have each publicly affirmed the existence of massive numbers of "illegal votes," in line with the narrative of President Trump in the creation of the Pence-Kobach Commission.  Commissioner Gardner has likewise made unfounded claims about illegal voting, and Commissioner McCormick has supported policies and practices that have disenfranchised voters.

195.   By failing to make provisions to "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," and "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or any special interest," 5 U.S.C. app. 2 § 5(b)(2)-(3), Defendants have violated a non-discretionary duty under FACA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Issue injunctive relief ordering Defendants

    a.   to make all records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by the Pence-Kobach Commission open for public inspection;

    b.   to hold all meetings of the Commission, including meetings conducted by telephone or other electronic medium, open to the public;

    c.  to cease all activities that have no reasoned basis and/or are not provided for in the Executive Order establishing the parameters under which the Pence-Kobach Commission can operate, including ceasing all activity aimed at investigating particular voters;

    d.  to make provisions to "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," and "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or any special interest"; and

    e.  to cease all action by the Commission until it is properly constituted.

(2)  Grant relief in the nature of mandamus compelling Defendants to perform all nondiscretionary duties required by FACA, including:

    a.  holding all meetings of the Commission, including meetings conducted by telephone or other electronic medium, open to the public.  5 U.S.C. app. 2 § 10(a)(1);

    b.  publishing timely notice in the Federal Register of every meeting of the Pence-Kobach Commission.  5 U.S.C. app. 2 § 10(a)(2);

    c.  keeping "[d]etailed minutes" of each meeting.  5 U.S.C. app. 2 § 10(c);

    d.  requiring that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [the Pence-Kobach Commission] shall be available for public inspection and copying."  5 U.S.C. app. 2 § 10(b);

e.  requiring that Defendants "make available to any person, at actual cost of duplication, copies of transcripts" of each meeting and proceeding.  5 U.S.C. app. 2 § 11(a);

f.  requiring "the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2);

g.  requiring that Defendants make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  5 U.S.C. app. 2 § 5(b)(3).

(3) Declare that the Defendants have violated §§ 5, 9, 10, 11 of FACA, including:

a.  that Defendants violated § 10(a)(1), (3) of FACA by holding the June 28, 2017 meeting of the Pence-Kobach Commission;

b.  that Defendants violated § 10(a)(2) of FACA by holding the June 28, 2017 meeting of the Pence-Kobach Commission without first publishing advance notice in the Federal Register;

c.  that Defendants violated § 10(c) of FACA by failing to create "detailed minutes" of the June 28, 2017 and September 12, 2017 meetings of the Pence-Kobach Commission;

d.  that Defendants violate § 10(b) of FACA by failing to make available all the Pence-Kobach Commission documents—including those documents related to the June 28, 2017 telephonic meeting, related to the July 19, 2017 and September 12,

2017 in-person meetings, made available to Vice Chair Kobach in his "official capacity as Vice-Chair of the Commission," and all other Commission documents—to the public for "inspection and copying at a single location" within the office of the Commission, including by failing to make public the location of the office of the Pence-Kobach Commission and the methods by which the public can access the Commission's documents, including, to the extent the Commission office is contained within the Office of the Vice President, by keeping the documents in an office largely closed to public access, and, to the extent the Commission office is contained in the GSA, by failing to make public the particular location of the office and methods by which the public can access the Commission's documents;

e.   that Defendants violated § 10(a)(1) of FACA by not permitting the public to physically access the July 19 meeting of the Pence-Kobach Commission, and ensuring this is the case by holding the July 19 meeting of the Pence-Kobach Commission in a building that is closed to the public without advanced screening and notice of individual attendance, and by conducting a livestream which was not continuously available for public viewing;

f.   that Defendants have violated § 9(c) of FACA by taking action prior to the filing of the Pence-Kobach Commission Charter.

g.   that Defendants have violated § 5(b)(2) of FACA by failing to "require the membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;" and

    h.   that Defendants have violated § 5(b)(3) of FACA by not making any provision "to

         assure that the advice and recommendations of the advisory committee will not be

         inappropriately influenced by the appointing authority or by any special interest,

         but will instead be the result of the advisory committee's independent judgment.

(4) Grant any other relief that the Court may deem just and proper.


                         Respectfully submitted,

                         */s/ Dale E. Ho*
                         Dale E. Ho (D.C. Bar No. NY0142)
                         Theresa J. Lee**
                         Sophia Lin Lakin**
                         American Civil Liberties Union Foundation, Inc.
                         125 Broad Street, 18th Floor
                         New York, NY 10004
                         Tel.: 212.549.2686
                         dho@aclu.org
                         tlee@aclu.org
                         slakin@aclu.org
                         ***pro hac vice*

                         Arthur B. Spitzer (D.C. Bar No. 235960)
                         American Civil Liberties Union Foundation
                          of the District of Columbia
                         915 15th Street, NW, 2nd Floor
                         Washington, DC 20005
                         Tel.: 202-457-0800
                         aspitzer@acludc.org


Dated:   December 12, 2017